SAM KAHN V. CITY OF HOUSTON ET AL.

No. 6042.   Decided April 21, 1932.
(48 S. W., 2d Series, 595.)

*Ansel M. Kahn, Henry E. Kahn,* both of Houston, and *Adrain F. Levy,* of Galveston, for appellant.

The court erred as a matter of law in refusing plaintiff's prayer to set aside, vacate and hold for naught said ordinance and contract, described in paragraph seven hereof, because said ordinance and contract are *ultra vires,* invalid, void and unconstitutional in that they violate Article 1, Section XVII of the Constitution of the State of Texas in our Bill of Rights in that plaintiff's valuable vested property and constitutional rights are being taken, damaged and destroyed without adequate compensation being first made and particularly because of the constitutional inhibition against the making of irrevocable and uncontrollable grants of special privileges and immunities and not subject to the control thereof.

The law is well settled in this state that one who purchases and buys property abutting on a street and public thoroughfares, and particularly with reference to a plan or map of the city in which said property is located, which facts are in the instant case, acquires a vested property right and interest in the street, which entitles him to its use free from obstruction and it is unnecessary that the obstruction should be in front of or near plaintiff's property. It will be noted, however, particularly, that plaintiff's property herein is only one hundred and fifty feet from the point at which said obstruction is contemplated, and it is undisputed that the railroad companies will totally and permanent obstruct the use of that part of Washington Avenue described in the ordinance. Santa Fe Townsite Co. v. Norvell (Texas Civ. App.), 207 S. W., 960; Spencer v. Levy (Texas Civ. App.), 173 S. W., 550; Bowers v. Machir (Texas Civ. App.), 191 S. W., 758; Blair v. Astin (Texas Civ. App.), 10 S. W. (2d) 1054; Powell v. Houston & T. C. Ry. Co., 104 Texas, 219, 135 S. W., 1153, 1155, 46 L. R. A., 615; City of San Antonio v. Rische, 38 S. W., 388; Quanah, Acme & P. Co. v. Swearingen (Texas Civ. App.), 4 S. W. (2d) 136 (writ refused); Kalteyer v. Sullivan, 18 Texas Civ. App., 488, 46 S. W., 288 (writ denied); Galveston Comm. Assn. v. Ort, 165 S. W., 907; State ex rel. Ellis v. Mulligan, 173 Mo. App., 718, 160 S. W., 9; People of Illinois v. Western Cold Storage Co., 287 Ill., 612, 123 N. E., 43, 11 A. L. R., 437.

*Sam Neathery, William D. Orem, Paul D. Page, Jr., John P. Bullington* and *Baker, Botts, Andrews & Wharton,* all of Houston, for appellees.

Plaintiff not abutting on that portion of Washington Avenue closed by the ordinance in question and not suffering any special injury peculiar to himself different in kind from that suffered by the public at large cannot complain of the closing even if the ordinance were void. Chambersburg Shoe Manufacturing Company v. Cumberland Valley Railroad Company, 87 Atlantic, 968; Bowers v. Machir (Texas Civ. App.), 191 S. W., 758; Galveston Commercial Association v. Ort (Texas Civ. App.), 165 S. W., 907; Reis v. City of New York, 80 N. E., 573; Cram v. City of Laconia, 51 Atlantic, 635; Johnson v. Andengaard, 110 N. W., 369; Guttery v. Glenn, 66 N. E., 305; American Construction Co. v. Caswell (Texas Civ. App.), 141 S. W., 1013; Shelton v. Phillips (Texas Civ. App.), 229 S. W., 967; Ebenezer Smith v. City of Boston, 61 Mass., 254; Ward v. Georgia Terminal Company, 84 S. E., 374; Bozeman v. City of St. Petersburg, 76 So., 894.

Even if plaintiff were damaged by the closing of Washington Avenue nevertheless, the street having been closed by a valid ordinance, there was no "taking" of plaintiff's property within the meaning of the Constitution and consequently plaintiff is not entitled to prior compensation for such damages, if any, so as to entitle him to an injunction on that ground. McCammon & Lang Lumber Company et al. v. Trinity & Brazos Valley Railroad Company, 104 Texas, 9; Duvall v. City of Dallas (Texas Civ. App.), 27 S. W. (2d) 1105; Johnson v. Lancaster (Texas Civ. App.), 266 S. W., 565; Jackson v. Birmingham Foundry & Machine Co., 45 So., 661; Ward v. Georgia Terminal Company, 84 S. E., 374; Cherry v. Fewell, 26 S. E., 798; Hubbell v. City of Des Moines, 154 N. W., 337.

MR. JUDGE RYAN delivered the opinion of the Commission of Appeals, Section B.

The Honorable the Court of Civil Appeals for the First District certify the following:

"Washington Avenue is now a paved, public thoroughfare in the City of Houston, beginning for its east end at Buffalo Bayou on the north side thereof between Third and Fourth streets, then running westward through the city into outside connections, and constitutes one of the main arteries of travel in, into, and out of Houston; at the time of the filing of this suit, which has to do more immediately with the section of it

lying between Sixth street on the east and Ninth (or Meek) street on the west, where its width was 80 feet, it was bounded on its north side by the present depot, yards, and terminal facilities of the appellee railroad companies—the H. & T. C. and the T. & N. O.—, and on its south side by appellant's properties, the Shepherd Laundries Company, the Brazos Hotel, and other business establishments; it had then been used as a public way of such relative position in and relationship toward the general travel within and through the City to the extent that, many decades before, it had become a dedicated street within the meaning of R. S. Article 5517, as the recorded maps, the history of the City, and the other evidence makes manifest; such travel at that time had a habit of flowing rather freely to and fro within, into, and out of the City along Washington east and west for the distance between the streets specified through Sixth street as an inlet or outlet.

"In 1927, for $52,500.00 cash, appellant bought the property he still owns at the corner of Ninth (or Meek) street on Washington, fronting 103 feet on the south side of the latter and running back 89 feet on the former, purchasing with reference to its location on these two public streets as so then existing and describing it, both as 'lots 6 and 7 in Block B-45, north side of Buffalo Bayou in the City of Houston,' and as 'also known as 813-15-17-19-21, Washington Avenue,' which property, while improved with business buildings for its entire extent and so abutting 103 feet on Washington, does not abut upon that particular part of it 'the City is attempting to close, but lies approximately 230 feet west of that portion * * * and is separated from that portion by an intersecting street known as Melnar or Eighth street, which runs south from Washington Avenue, but does not extend in a northerly direction across Washington Avenue.'

"During 1926 the appellee railroad companies had considered the erection of a new passenger station entirely on their own property approximately at the same location as their present one, and had prepared tentative plans therefor, the consummation of which, their executive vice-president testified, would have cost them about a million dollars less than will the completion of the plans for the same purpose they subsequently adopted and are now carrying out in collaboration with the City of Houston.

"Early in 1927, the City of Houston, contemplating a rather general public improvement program in that section of the City, with the further purpose of contributing to the elimina-

tion of traffic hazards and the control of flood waters in Buffalo Bayou; acting at first through its 'City Planning Commission' and subsequently by its Mayor and other officers, began negotiations with the two railroads looking to their changing the new station plan above outlined so as to conform instead to a different one the Planning Commission had devised, which contemplated the City's closing, deeding, and turning over permanently and exclusively to the Railroads for that purpose so much of Washington Avenue as lay between the west line of Sixth street and the east line of Eighth street, and the building of the new Southern Pacific depot terminals on that part of Washington, with a consequent rerouting of adjacent streets to fit.

"The evidence adduced on the hearing sustains the finding that as the railway station is now located and as the new station was intended by the Railroad Company to be located on the north side of the street and immediately fronting thereon, the traffic along the street was frequently greatly congested and the crossing of the street by pedestrians going to or from the station was dangerous and the use of the street at such times hazardous to the public, and that at least one person had theretofore been killed in crossing the street, and that the change of the location of the station in accordance with the plan of the City greatly reduces such dangers and hazards.

"Such change being thereafter mutually agreed upon, the three parties made a joint-enterprise of the undertaking, which the City's mayor testified was commonly referred to as 'the Southern Pacific Project,' in the way that is in controlling features, evidenced by, first, an original contract in writing between them of date July 17, 1929, second, an alternate like contract of the same date, and, third, an ordinance passed on January 28, 1931, by the City Council of the City, as in compliance with the latter's contractual obligations so assumed, which three documents are copied in full in the official Statement of Facts in this cause that accompanies this certificate and is asked to be considered a part thereof for the purpose of including them, the first one from pages 3 to 21, inclusive, the second one from pages 115 to 133, inclusive, and the third one from pages 22 to 45, inclusive, and also including the map found between pages 21 and 22 of such statement of facts, showing the location and connections of the streets involved in the proposed plan of the City.

"The hearing disclosed not only that the original contract had already been measurably and mutually executed—the Mayor

testifying that the City had spent and contracted to spend practically all of the $1,750,000.00 provided by its bond-issue for the project, while the Railroads had spent $825,000.00 in purchasing the Brazos Hotel and Shepherd Laundries properties, which were then in process of demolishment, as well as paid one-half the cost of two underpasses—but also that the purpose of all parties to it was to fully carry out all their joint and several undertakings according to its terms as soon as practicable—that is, the City, after having all existing street-car tracks and all sub-surface structures removed therefrom, would actually 'vacate, abandon, close and release to the Railroads,' 'all that part of Washington Avenue as now located lying and being situated between the west line of Sixth Street or Acuff Street and the east line of Eighth or Melnar Street,' 'so that hereafter there shall not be vested in the City of Houston, or the people of said City, or in any person whomsoever, any right, title, or claim, to the same, or any part thereof, as a street or passway,' and would 'make, execute, and deliver to said Houston and Texas Central Railroad Company the quit-claim deed or conveyance of the City of Houston granting, bargaining, selling and conveying to the said Railroad Company, and its successors and assigns, all of the right, title, interest, and claim of said City of Houston, to each and all of the said several tracts and parcels of land.' While upon their part, the Railroads would 'in consideration of the * * * agreements of the City herein contained * * * with all due diligence, as promptly as requisite and practicable, construct a new passenger station in what is now Washington Avenue, between Eighth or Melnar Street, and Sixth or Acuff Street.'

"Within a few weeks after the quoted ordinance was passed, appellant—expressly suing both for his individual and private benefit as a tax-paying abutting-owner on Washington, and as a member of the public and for its benefit, especially for that of all other members of it who were also abutting owners in like or similar situation with himself—sought an injunction herein, operative both against the City of Houston and the two Railroad Companies, restraining them from carrying out this plan for the closing and future appropriation of the two blocks of Washington Avenue as undertaken under the herein included contracts and ordinance, on the ground that he and those for whom he sued would thereby be wholly deprived of their vested property rights in the street and in its continued use as such for the private benefit of the two Railroad Companies, without any compensation having been made, or due process of law

had, all in violation of the Constitution of Texas, art. I, secs. 17, 3, and 19, art. XI, sec. III, art. III, secs. 35 and 57, art. V, sec. 8, and of the Constitution of the United States, sec. 1, of the XIV Amendment.

"The appellees made common cause in answer, presenting general demurrers and denials, invoking in support of what they had undertaken article 2, section 4, of Houston's City Charter conferring certain powers over its streets, and specially averring that it was their plan—for the public safety and benefit—to close such portion of Washington Avenue in order to eliminate certain grade-crossings and other traffic hazards from having such a thoroughfare directly in front of the railroad terminals, and to provide in lieu thereof a new thoroughfare one block to the south, 'which will lead directly into the City with only easy bends therein, and be so located as to provide a parkway and driveway between said main thoroughfare and the railway terminals'; they further charged appellant with laches in delaying the filing of his suit until after they had expended large sums in carrying out their plan for the rearrangement of Washington and other adjacent streets, which had then been a matter of public knowledge for several years.

"The trial court in all things refused the injunction prayed for, after hearing evidence from both sides, which, while sufficient to support a further finding that the closing of Washington as contemplated—with the consequent construction of the new station on the site and the proposed parkway in front of it, thus in effect 'dead-ending' it toward the City on the east at Melnar and there abruptly diverting for one block to the south all travel that otherwise would have directly flowed east and west through Washington—would in a measure constitute a protection to the general public through the elimination of certain now-existing traffic hazards thereon, at the same time compels the self-evident finding also that the use itself of that portion of the street as such would thereby be wholly withdrawn from the appellant, along with all those for whose benefit he sued, and thereafter be appropriated to the exclusive use and control of the Railroad Companies—either permanently, or at least so long as the obstruction stood or the original contract, together with the ordinance enacted in compliance therewith, should remain extant as recognized obligations of the City.

"Upon the foregoing statement, we respectfully submit for your decision the following questions:

"First: Are the contract of the City and the ordinance passed in pursuance thereof, before shown, void for want of

power in the City to close that portion of Washington Avenue before described for the purposes and to the extent stated therein?

"Second: Is the Act of the 41st. Legislature, amending Title 76 of the Revised Statutes (1925), restricting the right to injunction against the closing by a City of a public street of the City to the owner or lessee of real property actually abutting on that part of the street actually closed, unconstitutional?

"Third: Irrespective of the statute mentioned, will the closing of Washington Avenue, to the extent and for the purposes as shown in the original contract and the ordinance enacted in compliance therewith, constitute such a taking of appellant's property as an abutting owner thereon as entitles him to maintain a suit for injunction to prevent such closing without the City first condemning the property, as provided in our condemnation statutes?"

OPINION.

In Bowers v. City of Taylor, 24 S. W. (2d) 817, injunctive relief was permitted under a state of facts somewhat similar to those here.

Soon thereafter, the 41st Legislature at its fifth called session (chapter 84), enacted Senate Bill No. 62, which, omitting caption and enacting clause, reads as follows:

"Section 1. That Title 76, of the Revised Civil Statutes of the State of Texas of 1925, be amended by adding thereto Article 4646a, as follows:

"Art. 4646a.—No injunction shall be granted to stay or prevent the vacating, abandonment or closing, by the City Council or governing body of any incorporated city of this State, of any street or alley in any such incorporated city of this State, except at the suit of the owner or lessee of real property actually abutting on that part of such street or alley actually vacated, abandoned or closed, and then only in the event that the damages of said owner or lessee shall not have been released or shall not have been ascertained and paid in a condemnation suit by such city.

"Sec. 2. Provided that any person, who under existing laws has the right to enjoin a city from vacating, abandoning or closing any street or alley of such city and whose right to such injunction is denied by this Act, shall have the right to an action for damages for any injury that he may sustain by reason of the vacating, abandoning or closing of any street or alley by such city.

"Sec. 3. The fact that there is much confusion in reference to whether or not the right to enjoin a city from abandoning and closing a street applies only to abutting property owners, and the further fact that the decisions of the Courts of this State have rendered it doubtful as to what are the rights of the city, and the rights of property owners with reference to closing streets, creates an emergency and an imperative public necessity which requires that the Constitutional Rule requiring bills to be read on three several days be, and the same is hereby suspended, and that this Act shall take effect and be in force from and after its passage, and it is so enacted.

"Approved April 4, 1930.

"Effective 90 days after adjournment."

This act has the effect of denying injunctive relief in a class of cases where theretofore such relief was, under certain circumstances, available, and unless in contravention of the Constitution, must be respected.

■ In construing section 17, article I, of the Constitution, which is as follows:

"No person's property shall be taken, damaged or destroyed, for, or applied to public use without adequate compensation being made, unless by the consent of such person; and, when taken, except for the use of the State, such compensation shall be first made, or secured by a deposit of money; and no irrevocable or uncontrollable grant of special privileges or immunities, shall be made; but all privileges and franchises granted by the Legislature, or created under its authority shall be subject to the control thereof," our courts have drawn a distinction between the terms property "taken" and property "damaged or destroyed," in so far as requiring that when "taken" (except for use of the State) compensation shall be first made or secured by a deposit of money, whereas, when only "damaged or destroyed" that requirement does not obtain because there is no such "taking" within the meaning of the Constitution as requires payment in advance.

■ This distinction is important when the aid of equity is invoked, because (unless there is a "taking") if there be available an adequate remedy at law in damages, equity will not intervene by injunctive relief. McCammon & Lang Lumber Company v. Texas & B. V. Ry. Co., 104 Texas, 9, 36 L. R. A. (N. S.), 662, 30 A. & E. Ann. Cases, 1913E, 870; Johnson v. Lancaster, 266 S. W., 565; Duvall v. City of Dallas, 27 S. W. (2d) 1105; 2 Elliott Roads & Streets, sec. 1194.

In Duvall v. City of Dallas (writ of error refused), supra, the city's charter, as that of the City of Houston here, gives plenary power to the city over its streets and alleys, including the authority to "vacate and close the same"; the court held that where the closing of a street amounts to simply the infliction of an incidental injury such as where an easement is partially or wholly destroyed, and not a physical invasion or appropriation of the property, an adequate remedy at law exists in the recovery of damages and injunction will not issue to restrain progress of the work.

In the instant case, while a portion of Washington Street was ordered closed, its replacement by another street to be opened south of it is provided for, affording access to the business district of the city and elsewhere, and there will be no complete obstruction to the right of thoroughfare.

■ It has been held that there is no provision of the Constitution requiring pre-payment of compensation where the construction or operation of the work causes damage to the plaintiff but no property of his has been appropriated; the distinction between a "taking" and "damage" is thus controlling when the question is whether the work should be enjoined because of the non-payment or non-securing of compensation in advance as required by the Constitution. 16 Texas Jur., pp. 927 to 931. Where the vacated part is beyond the next connecting highway from the plaintiff's property so that he has access in both directions, the great weight of authority is to the effect that there is no "taking" of the plaintiff's property though the closing of the street at the point in question renders his property less valuable. 1 Lewis Eminent Domain (3rd Ed.), secs. 206, 207.

In Dallas Cotton Mills v. Industrial Company, 296 S. W., 503, the parties claimed under a common source proprietor who had subdivided the land and dedicated the streets platted thereon and purchase was with direct reference to this subdivisional and dedicatory plat. The City vacated and closed the street in question there, and Judge Nickels said that the city held a public easement, and the individual purchaser acquired a private easement; that the two could exist in contemporaneous and harmonious operation, or the one could be destroyed without necessary impairment of the other, and proper execution of the city's authority to "vacate and close" the street would enable it to relinquish the public easement but the private rights would be left intact.

■■ If, as contended by the city, the closing of the street in question is for the protection of the public in the elimination and relief of traffic and other hazards, and in lieu thereof other streets are opened, relocated and widened, then such closing. is for a public purpose and within the power of the city, but that of course cannot affect any private rights or easements, and the holders of such private rights and easements still have their remedy, either by injunction, if an abutting owner—if not, for damages, as may be proper. 1 Lewis Eminent Domain (3rd ed.), sec. 211.

Under the facts certified, we recommend that the questions be answered as follows—

*1st.*—The first question should be answered in the negative.

*2nd*—The act of the 41st Legislature amending Title 76 of the Revised Statutes of 1925 by adding thereto, article 4646a, is not unconstitutional.

*3rd.*—The proposed closing of Washington Avenue by the city, is, in the present case, not such a taking of appellant's property as entitles him to an injunction to prevent such closing without the city first condemning the property, as provided in our condemnation statutes.

The opinion of the Commission of Appeals answering the certified questions is adopted and ordered certified.

C. M. CURETON, Chief Justice.