**NUECES COUNTY DRAINAGE AND CONSERVATION DISTRICT NO. 2,**
Appellant,

v.

**W. M. BEVLY, Appellee.**

No. 905.

Court of Civil Appeals of Texas,
Corpus Christi.

Feb. 6, 1975.

Supplemental Opinion March 6, 1975.

C. Edwin Prichard, Jr., Prichard, Peeler & Smith, Corpus Christi, for appellant.

Findley L. Edmonds, Meredith & Donnell, Corpus Christi, for appellee.

## OPINION

BISSETT, Justice.

This is a suit for permanent injunction brought by W. M. Bevly (Bevly) against the Nueces County Drainage and Conservation District No. 2 (District) to restrain the District from enlarging an existing drainage ditch, located partly within and partly without the District. Suit was instituted on May 9, 1973. Following a jury trial, judgment was rendered which permanently enjoined the District from enlarging the ditch. The District has appealed. The controlling question presented is whether or not the proposed enlargement of the ditch will result in a "taking" of Bevly's land in the constitutional sense.

The District includes, among other areas, all of the City of Robstown, Texas. Sometime before suit was filed, the City of Robstown announced plans for the construction of an interior drainage system in the City, and the District informed the public that it proposed to connect such drainage system with an existing ditch operated by it, designated as Ditch "C", and to enlarge the ditch in order to take care of the volume of water that would then enter the ditch as a result of the construc-

tion of the interior drainage system by the City. The ditch, as it then existed, extended eastward from the City to Oso Creek, was 40 feet wide at the top, 15 feet wide at the bottom, and had been in existence for many years. If enlarged in accordance with the plans, it will be 86 feet wide at the top, 40 feet wide at the bottom, and about 12½ feet deep.

The place where the ditch releases its waters into Oso Creek is outside the boundaries of the District. That portion of the ditch west from Oso Creek to the east boundary of the District covers a distance of several hundred yards, and is on land that is owned in fee by the District. The remaining portion of the ditch, west from the east boundary of the District to the City of Robstown, covers a distance of several miles, is on an easement, and is located entirely within the boundaries of the District.

Bevly owns five separate tracts of land (about 1,000 acres) to the southeast of the place where the ditch empties into Oso Creek. Three of the tracts front on Oso Creek and the other two are crossed by the Creek. All of the tracts are outside the boundaries of the District, and are from five to nine miles east and southeast of the east boundary of the District. The tract closest to the place where the ditch intersects Oso Creek is about five miles downstream.

Bevly alleged that the District, if allowed to proceed with its plans, will take his lands in contravention of Section 17, Article I, of the Texas Constitution, Vernon's Ann.St. He prayed that the District be permanently enjoined from enlarging, or in any way changing, Ditch "C".

The jury, among other findings, found that the discharge into Oso Creek from the enlarged Ditch "C" will be a producing cause of erosion of Bevly's five tracts of land, and will also be a producing cause of damage to the tracts by flooding "outside of the present flood plain to a degree greater than will occur if Ditch 'C' is not enlarged".

The judgment of the trial court, in part, decreed:

" . . . NUECES COUNTY DRAINAGE AND CONSERVATION DISTRICT NO. 2, its commissioners, officers, employees and agents be, and they hereby are, permanently enjoined and restrained from enlarging the present drainage ditch, commonly referred to in the drainage plans of Defendant as 'Ditch C', as it existed on December 17, 1973, the date the jury verdict was received and ordered filed, . . ."

The trial judge, in his conclusion of law No. 1, which is set out in the judgment itself, concluded:

"1. Based upon the jury findings, the proposed enlargement of Defendant's Ditch 'C' will result in the 'taking' of Plaintiff's property in violation of Section 17 of Article I of the Constitution of the State of Texas; . . ."

The District, in its first point, attacks the judgment for the reason that the evidence does not show that the proposed enlargement of Ditch "C" will result in a "taking" of Bevly's land, and argues that since there was no "taking" of the land the trial judge was not precluded from balancing the equities of the parties. Bevly has challenged the point on the ground that it is multifarious because it embraces more than one point of error. In disposing of that challenge, we apply the rule announced in Fambrough v. Wagley, 140 Tex. 577, 169 S.W.2d 478 (1943). The rule so established, simply stated, is that if a point is sufficient to direct the Court's attention to the matter complained of, the Court will look to the point and the statement and argument thereunder to determine the question of reversible error. Under the rule of the Fambrough case, the point is sufficient. We will consider it.

Bevly further contends that the point should be overruled because the proposed

enlargement of Ditch "C" will result in an unlawful taking of his land for public use and that since such taking is void, it should be enjoined. He argues that as the District's right of eminent domain is restricted to the area lying within its boundaries, and since all five tracts of land are outside the District's boundaries, that the District simply has no power of eminent domain over his land. He maintains that the proposed enlargement of Ditch "C" will greatly increase its capacity for delivering quantities of water into Oso Creek, the result of which will cause the Creek to flood when it ordinarily would not; that the planned enlargement of Ditch "C" will result in irreparable damage to his land because of an increased volume of water reaching his land at an accelerated rate and standing thereon, and because of increased erosion of the land bordering the Creek.

It is clearly established by the evidence that the construction of the interior drainage project by the City, and the enlargement of Ditch "C" by the District, will give substantial drainage relief to the more than 10,000 inhabitants of the City of Robstown; will prevent considerable damage to both public and private property in the City; and will relieve health hazards in the City caused by present flooding due to inadequate drainage facilities. At the time of trial (December, 1973), work on the planned interior drainage project had not been completed, and Ditch "C" had not been enlarged.

Bevly's expert witness, Dr. Christopher C. Mathewson, an assistant professor of geology at Texas A & M University, testified that Oso Creek is presently out of balance, that it has been out of balance continuously since about 1915; that the Bevly tracts of land have already sustained substantial damage because of prior flooding and erosion; and that those tracts will be further damaged by flooding and erosion if the planned improvements are made, since the velocity of the water which now enters the Creek from the existing Ditch "C" will be greatly increased. He did not calculate the volume of water that Oso Creek now carries or could carry if Ditch "C" is enlarged. He said that when there are heavy rains, run-off water enters the flood plain of Oso Creek from the City of Robstown; from agricultural lands and oil fields; from other parts of the District; and from Corpus Christi, the "Corpus Christi Ditch" and the "Clarkwood Ditch", all of which are outside the boundaries of the District.

Dr. Mathewson further testified that under conditions existing at the time of trial, the five Bevly tracts will be damaged every time Oso Creek floods, which can be expected to occur on the average of every one and one-half years, and that there will be erosion of the creek banks where each tract borders the Creek, erosion of topsoil caused by flooding of the surface of the lands, and flooding of crops. He could not determine how much of Bevly's land was being damaged either in terms of the quantity of creek banks and topsoil lost by erosion, or in terms of dollars lost because of flooding of crops. He stated that such damage could be calculated, but that it would be time consuming and would requisite the assembling of "hundreds of years of information" at "phenomenal cost". He was not asked to calculate either the "cost" or the amount of damage.

Dr. Mathewson also said that the amount of water which will empty into the creek by an enlarged Ditch "C" will not "alone" flood Bevly's land, that the effect of such enlargement will increase "the already flooded conditions downstream on Mr. Bevly's property", and "it's just that it's getting to the Oso Creek faster because its going out of Robstown and it's not lying around in Robstown and then slowly flowing downstream". He did not say what portion of the total damages sustained by Bevly would be attributable to the proposed enlargement of Ditch "C" and how much of such damages would be attributable to the volume of water now entering the Creek from Ditch "C", or from other

sources that deposit run-off waters into the Creek.

The District's expert witness, Mr. Eugene Urban, the engineer who designed the proposed drainage system under attack, testified that it was necessary that Ditch "C" be enlarged as an outfall ditch for the City of Robstown's interior drainage system; and that the completion of the proposed drainage project will not cause any different effect downstream than that which was already taking place. He further testified that Ditch "C", if enlarged, could run brimful, which, of itself, still would not flood the Bevly land.

Both Dr. Mathewson and Mr. Urban agreed that there were many factors other than Ditch "C" which had a bearing on the fact that Bevly's tracts are now being flooded, and that the amount of water that is deposited by rainfall is not normally uniform throughout the District, in the Oso Creek flood plain itself, or in areas outside of the District that drain into the Creek. Neither witness concluded that the erosion and flooding of Bevly's land now going on because of the amount of run-off water which enters Oso Creek, or its flood plain can be limited to a single source.

Bevly testified that for many years prior to the time of trial his five tracts of land had sustained continuous damage because of the overflow of Oso Creek, and that such flooding had been greater during the "last few years". He further testified that in years gone by, a considerable number of acres had been lost by erosion; that the flood waters from the Creek had deposited debris on his land that had to be removed by him at considerable expense, had caused him to lose crops, and had made it impossible to farm all of the land involved; and if Ditch "C" is enlarged that the water will reach his land at an accelerated rate, and will rise higher on his land than has heretofore occurred.

It was established by the testimony of other witnesses, each of whom owned land outside of the District that bordered on Oso Creek, that the Creek floods when a 10-inch rain falls (which is frequent), and that their lands were damaged following a heavy rain. They further testified that within the last 10 years heavy rains have caused water to back up and spread over considerable acreage in and around the area where Ditch "C" empties into the Creek.

The petition denominates the action as one for a threatened "taking" of private lands for a public purpose without the consent of the landowner. Bevly did not allege a cause of action for "damaging" his land. He did not seek compensation for either the taking or damaging of his property, but sought relief only by way of injunction. Bevly rests his case solely on the proposition that the threatened acts will constitute a taking of his land by inverse condemnation, and since the District does not have any power to condemn any part of his land by direct proceedings, or otherwise, that the threatened taking is void.

Section 17, Article I, of the State Constitution, reads, in part, as follows:

"Sec. 17. No person's property shall be taken, damaged or destroyed for or applied to public use without adequate compensation being made, unless by the consent of such person; . . ."

The District is an existing and operating Conservation and Reclamation District under Section 59, Article XVI, of the State Constitution. In the Act validating the District, H.B. 972, Acts 57th Legislature, 1961, it was provided, in part:

". . . the exercise of the right of eminent domain, under the provisions of this Act, shall be limited to that area lying within the district."

■■ Our courts have consistently held that a "taking" of land within the concept of Section 17, Article I, of the State Constitution, means an actual physical invasion or an appropriation of the land, and that incidental or consequential injury to land not actually and physically invaded or ap-

propriated gives rise to a cause of action for damages only. McCammon & Lang Lumber Co. v. Trinity & Brazos V. Ry. Co., 104 Tex. 8, 133 S.W. 247 (1911); Duvall v. City of Dallas, 27 S.W.2d 1105 (Tex.Civ.App.—Dallas 1930, writ ref'd). A "damaging" within the purview of the Constitution imports that the land involved has been injuriously affected without appropriation of, or intrusion upon, the land itself. Webb v. Dameron, 219 S.W.2d 581 (Tex.Civ.App.—Amarillo 1949, writ ref'd n. r. e.). The distinction between "taking" and "damaging" is important where equitable relief is sought, because an injunction will not issue to restrain a threatened "damaging". Kahn v. City of Houston, 121 Tex. 293, 48 S.W.2d 595 (Tex.Comm'n App.1932, opinion adopted); Scott v. City of Robinson, 404 S.W.2d 330 (Tex.Civ. App.—Waco 1966, writ ref'd n. r. e).

It is a fundamental rule, that as a primary predicate for the granting of an injunction because of a threatened act, plaintiff must show, as a result of the threatened act, that he will not only suffer an injury, but that he has no adequate remedy at law. King's Estate v. School Trustees of Willacy County, 33 S.W.2d 783 (Tex. Civ.App.—San Antonio 1930, writ ref'd); Smiley v. City of Graham, 37 S.W.2d 289 (Tex.Civ.App.—Fort Worth 1930, writ dism'd).

In Holderbaum v. Hidalgo County Water Improvement Dist. No. 2, 297 S.W. 865 (Tex.Civ.App.—San Antonio 1927, affirmed 11 S.W.2d 506, 1928), it was alleged by plaintiff, who owned land abutting one of the canals operated by the district, that the canal periodically overflowed and ruined a number of fruit trees on his land; that 18 acres of his land became "valueless"; that the "waterlogging" of the land is progressive and "ruins" additional land each year; and that the acts of the District in operating the canal caused flooding of his land which amounted to a "taking" of the land under the Constitution. The court held that the acts complained of did not constitute a "taking", but did amount to a "damaging".

In Dallas Hunting & Fishing Club v. Dallas County Bois D'Arc Island Levee District, 235 S.W. 607 (Tex.Civ.App.— Dallas 1921, no writ), where the district built a levee off of plaintiff's premises which caused water (during times of floods) to run across plaintiff's land with great violence and to stand thereon for a long period of time, it was held that the construction of the levee did not constitute the taking of plaintiff's property, but that the same merely "damaged" the land and could not be enjoined.

The irrigation district, in Donna Irrigation District No. 1 v. Piper, 269 S.W. 157 (Tex.Civ.App.—San Antonio 1925, no writ), proposed to broaden the base and raise the height of an existing levee. Plaintiffs, whose lands were located at distances which varied from 1,000 feet to 1½ miles from the levee, sued to enjoin such broadening and heightening of the levee on the ground that their lands would be "taken" because the planned improvements, if constructed, would cause water to remain on their lands "for a longer time than has heretofore occurred in ordinary major overflows, and same will cause permanent and irreparable injuries to plaintiffs' lands". The trial court granted a temporary injunction. The Court of Civil Appeals reversed the judgment of the trial court, dissolved the injunction, and held that even though the broadening and heightening of the embankment along a channel would damage plaintiffs' lands, yet under the terms of the Constitution such cause of action would not be that of "taking" the land. The facts of the Piper case make it somewhat analogous to those in the case at bar. There, a statute provided that the irrigation district could not condemn any lands except those necessary to the purposes enumerated in the act creating the district. In the instant case, a restriction existed on the District's power of eminent domain in that the District's right

of eminent domain was limited to that area lying within its boundaries.

In City Commissioners of Port Arthur v. Fant, 193 S.W. 334 (Tex.Civ.App.—Beaumont 1916, no writ), where the City, in order to provide proper drainage, planned to construct a ditch down a certain street and suit was brought by a landowner, who owned land which adjoined the street, to enjoin its construction on the grounds that the same constituted the "taking" of his property under the Constitution, it was held that adjoining property owners to the street did not have the right to injunction because the city was not "taking" the land.

The case of Tarrant County Water Control & Improvement Dist. No. 1 v. Reid, 203 S.W.2d 290 (Tex.Civ.App.—Fort Worth 1947, writ ref'd n. r. e.) is persuasive. There, Reid, who owned land which was situated approximately three miles upstream from a dam, contended that the construction of the dam and the lake created thereby, resulted in the slowing down of overflow water across his land and caused the deposit of sand, gravel and debris thereon to the extent that its usefulness was destroyed. He further contended that the slowing down of water caused the channel of the river adjacent to his land and the branch (from the river) running through his land to be so filled with sand that they were rendered wholly inadequate to carry the normal flow of water, and that the slowing down of the overflow water amounted to a "taking" of his land. The Court of Civil Appeals concluded that any cause of action which Reid had against the District by reason of the water slowing down was for "damaging", rather than for "taking".

The plaintiffs, in Schulman v. City of Houston, 406 S.W.2d 219 (Tex.Civ.App.—Tyler 1966, writ ref'd n. r. e.), brought suit to enjoin the city from constructing and operating a garbage compost plant within the city. The plaintiffs, who owned land in the area in which it was proposed to locate the new plant, claimed, among other things, that the plant would constitute a public nuisance. The city owned the land on which the plant was to be built. The trial court denied the petition for injunction. The Court of Civil Appeals, in affirming the judgment, stated:

" . . . the garbage compost plant is a permanent improvement designed to take care of the ever increasing needs of the city for the disposal of garbage, and it is to be maintained for the public purpose of disposing of garbage and for the welfare of the community. It is a lawful business and an operation not subject to abatement by injunction by citizens of the city. Appellants' remedy, if any at all, is at law if the compost plant should in fact be operated as a nuisance to their damage. (citing authorities)"

The recurring floods in Texas, together with devastating property damages and health hazards caused thereby led to the adoption (in 1917) of Section 59 to Article XVI of the Texas Constitution. Subsection (b) thereof provides:

"(b) There may be created within the State of Texas, or the State may be divided into, such number of conservation and reclamation districts as may be determined to be essential to the accomplishment of the purposes of this amendment to the constitution, which districts shall be governmental agencies and bodies politic and corporate with such powers of government and with the authority to exercise such rights, privileges and functions concerning the subject matter of this amendment as may be conferred by law."

The amendment is a mandate that the State do something which will prevent floods. The District was established pursuant to that command and under the authority of the amendment. The Act creating the District recites that it was established "for the sole purpose of the reclamation and drainage of its overflowed lands and other lands needing drainage". It was legally

authorized to enlarge an existing ditch if that was necessary to control the floods which occurred within its boundaries. Bevly does not question the right of the District to enlarge that portion of the Ditch which is situated within the District's boundaries, but makes a point that part of the ditch is outside the District. We do not consider that fact to be controlling. Nothing is shown by the record which legally prohibits the District from enlarging an existing ditch on its own land, regardless of whether the same be located within or without the boundaries of the District.

In order for Section 59 of Article XVI to be meaningful, a proper place must exist to drain flood waters that ravish the area within the boundaries of the District. The record here shows that Oso Creek is a natural place to drain the surface waters in the area of the City of Robstown, since the rainfall which occurs in that part of the District normally drains eastward toward Oso Creek. There is no evidence that the flood water which will reach the Creek if Ditch "C" is enlarged, is water that is diverted from any other watershed. All of the area which will be served by the planned improvements is within the watershed of Oso Creek. While the place where Ditch "C" intersects the Creek is east of the east boundary of the District, the Creek begins at a point just outside the north boundary of the District, about a mile north of the place where the ditch crosses the District's east boundary. It traverses part of the northeast portion of the District. Bevly does not claim that the District could not empty its flood waters into the Creek by locating the ditch farther to the north where it would empty into the Creek directly within the District's boundaries.

For many years before this suit was filed, Bevly's lands were being damaged because of the overflows of Oso Creek. Such overflows are caused by many factors and from several sources, many of which are beyond the control of the District. Included therein is a ditch from the City of Corpus Christi whose capacity is three times that of Ditch "C"; it contributes materially to the overload of flood water in the Creek. The damage caused by the flooding of Oso Creek is not limited just to the Bevly tracts, but extends to and affects large acreages downstream from the point where Ditch "C" discharges its water into the Creek. Oso Creek empties into Oso Bay a few miles downstream from the Bevly lands. The Creek is not too many feet above sea level where it borders the Bevly and other landowners' lands. The record shows that flood water which will enter the Creek from Ditch "C", if enlarged, standing alone and of itself, will not cause Bevly's lands to be damaged by either erosion or flooding.

■■ The decisions of the courts of this State are in harmony in holding that drainage districts, levee improvement districts, and other districts of a similar nature are responsible for damage or injury to a person's property inflicted in the performance of their acts and functions primarily for the benefit of the people within the boundaries of the district. City of Amarillo v. Ware, 120 Tex. 456, 40 S.W.2d 57 (1931). However, the improvement, where it is permanent and not likely to be removed, even though it would be a nuisance if built by private enterprise, is not abatable by injunction unless the same contravenes the Constitution or violates a statute. Baugh v. Texas & N. O. R. Co., 80 Tex. 56, 15 S.W. 587 (1891); Rosenthal v. Taylor, B. & H. Ry. Co., 79 Tex. 325, 15 S.W. 268 (1891); Gainesville, H. & W. R. Co. v. Hall, 78 Tex. 169, 14 S.W. 259 (1890).

■ The rationale of the decisions is that where a governmental agency, in the exercise of a governmental function, constructs a permanent improvement that benefits a large segment of the public which does not amount to a physical invasion or appropriation of a person's land, but where the owner's land is so situated with reference to the improvements that his

land suffers injury by reason of the operation of such improvement, a claim for such injury is merely incidental or consequential. It becomes one for "damaging", rather than one for "taking". That is the case here.

 Unquestionably, the District is a valid and existing governmental agency that has lawful authority to build, change and maintain the planned drainage facilities. Bennett v. Brown County Water Improvement District No. 1, 153 Tex. 599, 272 S.W.2d 498 (1954). The enlargement of Ditch "C" is a necessary incident to the proper operation of the District's drainage system. It will be permanent. Even if the District was guilty of threatening a nuisance (which we do not hold), Bevly would not be entitled to a permanent injunction, but would be relegated to his remedy for damages since the proposed public improvement, being permanent and lawful, is not abatable by injunction. City of Amarillo v. Ware, supra; City of Dallas v. Winans, 262 S.W.2d 256 (Tex.Civ. App.—Dallas 1953, no writ); 27 Tex. Law Rev. 263.

 The liability of the District for "damaging" is one thing and the "cause of action" asserted by Bevly in this case is something else. They should not be confused. We hold that while the District did not have the right to actually invade or appropriate land outside its boundaries under the power of eminent domain, it did have the right to construct the proposed drainage improvement, even though the construction of the same might cause consequential damage to lands outside its boundaries. The owners of lands situated outside the District hold their lands subject to the burden which, necessarily, is part of Section 59 of Article XVI of the State Constitution, the burden of incidental damages caused by the construction of drainage facilities by an agency of the State.

The proposed enlargement of Ditch "C" is lawful. The ditch is not located on Bevly's land and its proposed enlargement,

as such, does not amount to a threatened physical invasion or appropriation of his land. The damages, if any, which may be inflicted by the enlargement of the ditch would be merely incidental. Bevly's land had not been "damaged" or "taken" at the time of trial because of the planned enlargement of Ditch "C". The acts which the trial court enjoined constituted, at most, a threatened "damaging", not a threatened "taking". Even though the District may be liable for damages caused by the actual enlargement of Ditch "C", that question is not before us in this appeal and we express no opinion thereon. Bevly makes no claim for damages in this case.

Having held that the proposed enlargement of Ditch "C" did not constitute a threatened "taking" of Bevly's land, we now consider whether or not the trial court was precluded from applying the doctrine of balancing the equities if, in fact, the planned enlargement of Ditch "C" by the District amounted to a nuisance. The trial judge, in his conclusions Nos. 2 and 3, which are also contained in the judgment, concluded:

"2. Because of such an unconstitutional taking, the trial court is precluded from applying the equitable doctrine or maxim of balancing of the equities of the parties;

3. If the trial court were free to balance the equities, the trial court would deny to Plaintiff the permanent injunction herein granted, the Court being of the opinion that the equities are with the Defendant; . . ."

 Injunctions may be denied even in cases where irreparable injury is shown and where no adequate remedy at law exists, if it is reasonably clear that the injury or damage to the party who seeks the relief will be much less if the writ is refused than that which would result to the party restrained if the relief be granted. Texas Practice, Vol. 6, Balancing of Equities, § 115, (1973); 31 Tex.Jur.2d, Injunctions, § 42. The matter of public con-

venience and general welfare is of paramount importance in situations where an individual seeks to enjoin a governmental agency from constructing public works that affect a large segment of the public generally. Lower Nueces River Wat. Sup. Dist. v. Live Oak County, 312 S.W.2d 696 (Tex.Civ.App.—San Antonio 1958, writ ref'd n. r. e.); Hooks Telephone Company v. Town of Leary, 352 S.W.2d 755 (Tex.Civ.App.—Texarkana 1961, no writ).

In Mitchell v. City of Temple, 152 S.W. 2d 1116 (Tex.Civ.App.—Austin 1941, writ ref'd w. o. m.), plaintiffs brought suit for an injunction against the city to abate the operation of a sewage disposal plant. The suit was for injunction only, and not for damages. The trial court refused to grant the injunction and concluded that even if the operation of the plant did constitute a nuisance, that much greater damage and inconvenience would result to the inhabitants of the City of Temple if the injunction was granted than would result to the plaintiffs if it was denied, and further, that the plaintiffs had an adequate remedy at law for damages. The Court of Civil Appeals affirmed and said:

". . . and if granting the injunctive relief works a greater hardship and greater injury upon the public than would result to the plaintiff by its denial, he (the trial court) is clearly authorized to deny it. . . ."

. . . . . .

"The general rule seems to be that if public necessity, public health and convenience outweigh any resulting private injury, or if granting the writ will cause great harm to the public, the writ will be refused. . . ."

The court, in Hogue v. City of Bowie, 209 S.W.2d 807 (Tex.Civ.App.—Fort Worth 1948, writ ref'd n. r. e.); observed:

"It seems to be the settled law in this state that courts will deny equitable injunctive relief to a complaining party, if by balancing the equities between him and the general public more harm and inequities would follow to the many than to the complaining one, if such relief be granted. . . ."

The record shows that the proposed drainage system will greatly benefit the inhabitants of the City of Robstown. The purpose of enlarging the drainage ditch, together with the City's implementation of their new underground drainage system, was to alleviate flooding in the City. Mr. B. D. Berryman, mayor of Robstown, testified that the present drainage system in the City is completely inadequate, and that there is serious flooding in the City. Mr. A. J. Veselka, the chief administrator of the City of Robstown, testified that under conditions presently existing, flood waters enter the sewer system causing sewer lines to spew water, and that because of inadequate drainage facilities, standing water (following a heavy rainfall) permeates the pavement of city streets, which causes a deterioration of the base and the subsequent failure of the streets. The long range result is that a complete rebuilding of the streets from the base up is required from time to time. At present, the 10 block area of Buena Vista Street from Avenue A to Avenue J, because of such deterioration, requires a rebuilding of streets at an estimated cost of $160,000.00. Mr. Veselka further testified that dirt and sand now enter the City's sanitary sewer system with flood water which necessitates the cleaning of lines, lifting stations and basins. The repair of such facilities is costly since it requires special equipment and an outside contract.

The City's projected interior drainage project cannot be implemented without the corresponding enlargement of Ditch "C". The City has already voted bonds for drainage improvements in the amount of $750,000.00, and has received a grant of $618,000.00 from an agency of the Federal Government (HUD) to help with the cost of the proposed interior drainage system. If the grant is not used for that purpose, it will be lost.

There is nothing in the record before us that precluded the trial court from applying the doctrine of balancing of the equities between the parties. It appears to us that the enlargement of Ditch "C" is in the public interest and convenience, and is necessary in order to alleviate a situation that poses a substantial danger to the health and welfare of the people of the City of Robstown. The granting of the injunction has resulted in public inconvenience to a large number of persons not parties to the suit which is disproportionate to the damage which would have been suffered by Bevly had the petition for injunction been denied. The interests of such a large number of people should not be subordinated to the private interest of a single landowner. The equities are with the District. The trial court was clearly authorized to take into consideration such consequences to the City of Robstown and its inhabitants as far outweighing any injury that might result to Bevly from the enlargement of the ditch. Bevly may have an adequate remedy at law by way of damages if the ditch, when enlarged, causes injury to his land. The District's first point of error and its second point, wherein it is claimed that the trial court erred in granting the injunction "for the reason that appellee has an adequate remedy at law", are each sustained.

Since the case must be reversed, there is no need for us to consider any of the District's remaining thirteen points of error. Accordingly, the judgment of the trial court is reversed, the permanent injunction heretofore granted by the trial court is dissolved, and judgment is here rendered that W. M. Bevly take nothing in his suit against the Nueces County Drainage & Conservation District No. 2.

Reversed and rendered.

## SUPPLEMENTAL OPINION

### PER CURIAM.

The question as to disqualification of two of the Justices sitting on this Court has arisen following submission and oral argument in this case. It was discovered subsequent to submission of the case that Chief Justice Paul W. Nye and Associate Justice Horace S. Young own real estate that is located within the territorial boundaries of the appellant Nueces County Drainage and Conservation District No. 2, and as such are taxpayers within the District. The attorneys for the appellee and appellant were advised of this situation. The Court requested that they brief the question of whether such interest of the two Justices would be grounds for disqualification and asked them to furnish the Court with letter briefs outlining the respective positions of their clients on this question.

The appellant in its brief to this Court expressly stated that there was no disqualification of either Chief Justice Nye or Associate Justice Young by virtue of their owning lands within the boundaries of the drainage district (citing authorities). The appellee, although not specifically stating whether these Judges were disqualified or not, expressed his opinion that if a judge is "interested" in the case, his disqualification is absolute or mandatory, and he must under such circumstances disqualify himself from hearing the case (citing authorities). The interest, if any, of the Justices in this case, according to appellee, is in the nature of their being property owners and taxpayers within the appellant political subdivision. They cite cases which apparently require that for the "interest" of the Judge to be such as to require disqualification it should be a "pecuniary" interest. The appellee speculates that if either of the Justices here should have such a pecuniary interest in this case, it would be in the possibility of additional taxes or of enhanced property values resulting from their decision in this case. The appellee further suggests that the Court should proceed with caution because the Judges themselves have raised the question of disqualification and that, therefore, in their opinion, the case should be transferred to another Court of Civil Appeals.

■ We have several alternatives available to us and have considered each very carefully. First, only the Supreme Court has the power to transfer cases from one Court of Civil Appeals to another. This is generally done to equalize the dockets of the various Courts of Civil Appeals. Second, if we decide that we are disqualified, we are authorized under Tex. Const. Art. V, § 11, to certify this fact to the Governor of Texas, who shall immediately commission the requisite number of judges (two in this case) for the determination of this cause.[1] However, if we proceed in this manner and if after the special commissioned judges appointed by the Governor have decided the case, it should thereafter be determined that Justices Nye and Young were not disqualified as a matter of law under the facts and circumstances of this case, then such certification would have been improper and the rights of the parties would have been abused. The disposition of this case in this manner would be unduly lengthened and the judgment of the newly constituted court might be later set aside as we have here indicated.

We next considered the possibility of certifying this specific question of disqualification to the Supreme Court as is authorized by Rule 461, Texas Rules of Civil Procedure. If this was to be our course of action, the procedure would be for the Court to prepare and certify the specific question to the Supreme Court. At the same time, this Court would determine that it was or it was not disqualified, setting forth its reasons in a written opinion. This procedure would again unduly lengthen the time required for the parties to bring this case to its final disposition, in that the Supreme Court would only determine the question certified. The case would still have to be determined on the merits either by this Court or by special judges and finally by the Supreme Court.

■ The question also arises under this procedure as to whether our question consists of the proper subject matter for a certified question. Although the rule (461, T.R.C.P.) provides that the Supreme Court may in its discretion determine a law question, the Supreme Court has previously held they will decide certified questions from the Court of Civil Appeals only when the answer to such questions will be *determinative of the outcome of the litigation*. Morris v. Scaling, 162 Tex. 18, 344 S.W.2d 161 (1961); Uvalde Rock Asphalt Co. v. Hightower, 135 Tex. 410, 144 S.W.2d 533 (1940). The answer to the question of disqualification by the Supreme Court would not determine the outcome of the subject litigation that is now under submission.

Another alternative, which we believe to be the most responsive to the interest of justice as to both parties herein involved, is that we, as a Court, should make a determination of whether we are or are not disqualified; if we are not disqualified, decide the case on its merits and then allow the parties to amend their briefs to raise the question of disqualification and proceed to the Supreme Court accordingly. After a very careful review of the authorities hereinafter discussed on the subject, we have determined that, although both Chief Justice Nye and Associate Justice Young

1. Art. V, § 11, reads as follows: "No judge shall sit in any case wherein he may be interested, or where either of the parties may be connected with him, either by affinity or consanguinity, within such a degree as may be prescribed by law, or when he shall have been counsel in the case. When the Supreme Court, the Court of Criminal Appeals, the Court of Civil Appeals, or any member of either, shall be thus disqualified to hear and determine any case or cases in said court, the same shall be certified to the Governor of the State, who shall immediately commission the requisite number of persons learned in the law for the trial and determination of such cause or causes. When a judge of the District Court is disqualified by any of the causes above stated, the parties may, by consent, appoint a proper person to try said case; or upon their failing to do so, a competent person may be appointed to try the same in the county where it is pending, in such manner as may be prescribed by law."

own land within the Drainage District and are liable for taxes within that district, neither are disqualified for such reasons from sitting on this case on appeal.

The grounds for disqualification of the Judges in this State are prescribed in the Constitution. "No judge shall sit in any case [in which] he may be interested" is the language of the provision we are called upon to construe. Tex. Const. Art. V, § 11. The interest of a judge, in order that he would be disqualified, must, in general, be a direct pecuniary or property interest in the subject matter of the litigation. Fry v. Tucker, 146 Tex. 18, 202 S.W.2d 218 (1947); Lindsley v. Lindsley, 152 S.W.2d 415 (Tex.Civ.App. —Dallas 1941), rev'd on other grounds, 163 S.W.2d 633 (Tex.Sup.1942); City of Dallas v. Peacock, 89 Tex. 58, 33 S.W. 220 (1895); Chambers v. Hodges, 23 Tex. 104. A remote or problematic interest or one merely in the legal question involved will not suffice. Where a judge's pecuniary interest is not specially affected, a judge is not by reason of being a taxpayer disqualified from sitting in a case although he may have a merely incidental, remote, contigent or possible pecuniary interest in the subject matter of the suit. Wagner v. State, 217 S.W.2d 463 (Tex.Civ.App.—San Antonio 1948, writ ref'd n. r. e.). See also McInnis v. Brown County Water Improvement Dist. No. 1, 41 S.W.2d 741 (Tex.Civ.App. —Austin 1931, writ ref'd); Moody v. City of University Park, 278 S.W.2d 912 (Tex. Civ.App.—Dallas 1955, writ ref'd n. r. e.); Gossett v. State, 417 S.W.2d 730 (Tex. Civ.App.—Eastland 1967, writ ref'd n. r. e.); 33 Tex.Jur.2d Judges § 45 (1962).

It was recognized early in Texas Jurisprudence that the mere fact that a judge is a taxpayer of a city does not as such work a disqualification of the said judge. If it were otherwise, it would be difficult, if not impossible, to get cases tried. See City of Dallas v. Peacock, 89 Tex. 58, 33 S.W. 220 (1895). The court in Peacock stated:

"In respect to the question before us the relation of a taxpayer of a city to the city is not different from that of a taxpayer of a county to a county. Neither is it distinquishable in principle from that of one who owns taxable values in the state to the state. Yet that taxpayers in the state are qualified to sit as judges and jurors in all state cases cannot be questioned. So, also, so far as we know, it has never been questioned in this state that the taxpayers in a county are competent jurors in all cases, civil and criminal, in which the fines and penalties recovered go to the use of the county. The necessity from which this results does not change the principle. The principle is that the interest—if such it may be called—is so indirect, remote, and contingent that to hold a judge or juror not disqualified by reason thereof does not conflict with that fundamental doctrine laid down in City of London v. Wood and Taylor v. Williams, supra, that a man cannot be made a judge in his own case. . . ."

See also City of Dallas v. Armour & Co., 216 S.W. 222 (Tex.Civ.App.—Dallas 1919, writ ref'd).

In a more recent case, the Supreme Court stated that it was a well settled rule that as a citizen of Mission and a patron of its water system a judge's interest is in common with that of the public and is, therefore, not disqualified from sitting in the case. Hidalgo County Water Improvement District No. 2 v. Blalock, 157 Tex. 206, 301 S.W.2d 593 (1957). It was not shown that any pecuniary gain or loss would result to Judge Blalock directly upon the event of the suit. The Supreme Court in holding Judge Blalock was not disqualified said:

"If his interest in the question is indirect, uncertain, or remote, and the result of the suit will not necessarily subject him to a personal gain or loss, he is not disqualified to sit in the case."

We believe that the Justices of this Court have a responsibility to the people who reside within the twenty (20) counties making up the Thirteenth Supreme Judicial District and to the people of Texas to first, disqualify themselves if we have a pecuniary interest in a case. We believe that we have an equal responsibility to these people to raise the question of our disqualifications whenever we think that the same might be present. Our responsibility is the same as the attorneys and litigants, if they believe a judge or even a juror is disqualified. We also believe, however, that we have a responsibility to the people of Texas and in particular to the people who live in the Thirteenth Supreme Judicial District, to accept and decide, if possible, all cases filed in our Court even though they may be difficult and even though they involve governmental agencies, taxing authorities, banks or other public institutions, unless of course, it is made to appear that one or more of us are disqualified under the law. Our extensive research and investigation does not show that either of the Justices named are disqualified in this case. Although two of them are taxpayers and property owners within the Drainage District, such "interest" is so indirect, remote and uncertain under the facts and circumstances of this case that such does not disqualify them. We believe our duty is to decide this case without delay and at the same time allow the parties to test our qualifications on appeal to the Supreme Court if they deem it necessary.

■ Ordinarily, the interest of a judge in a public company or public enterprise which a judge shares with other members of a community is not one that disqualifies him from sitting in a case. It has been held by our Courts that a judge is not disqualified (provided his pecuniary interests are not specifically affected) in situations involving cases brought: (1) to determine the validity of lands or of a statute that authorizes their issuance; (2) to recover on municipal bonds; (3) to establish as a general deposit county and school funds deposited in a bank that subsequently was closed for liquidation; (4) to condemn lands; (5) to question the validity of a tri-county junior college district; (6) to recover damages of a city; (7) to enjoin the construction of an electric light plant; (8) to cancel a contract with a county; (9) to enjoin the execution of a contract for the paving of a highway; (10) enjoining or dissolving injunctions restraining drainage. See 33 Tex.Jur.2d Judges § 45. This Court has sat in cases involving annexation, taxation, and condemnation. Such list of situations is not deemed to be exclusive but such appears to be the most often encountered circumstances when such question of disqualification arises.

Under the Code of Judicial Conduct, Canon 3, Sec. C(3)(b), the term "Financial Interest" is defined to mean ownership of a legal or equitable interest, however small. Here, there is no definite interest involved, there being only a remote, uncertain speculative interest in common with the other taxpayers in the county.

Our research shows us that other states have many similar holdings to those of Texas. Generally, it has been held that an interest which a judge has in common with many others in a public matter is not sufficient to disqualify him. Where the interest of a judge as a resident, taxpayer, or property owner is not direct or immediate but remote or contingent, such interest ordinarily is not sufficient per se to disqualify him. Thus, a judge is not disqualified to hear and determine a cause in which a municipality, county, or other subdivision of the state is interested merely because he is a resident or taxpayer or both of such political subdivision. See 48 C.J.S. Judges § 80. See also Russell v. Wheeler, 165 Colo. 296, 439 P.2d 43 (1968); McMullen v. State, 93 Fla. 693, 112 So. 462 (1927); State v. Jefferson Parish School Board, 206 La. 317, 19 So.2d 153 (1943); City of Valdosta v. Singleton, 197 Ga. 194, 28 S. E.2d 759 (1944); Cimarron Utilities Co. v.

City of Guymon, 171 Okl. 344, 43 P.2d 143 (1935); Sheldon v. Board of Education of City of Lawrence, 134 Kan. 135, 4 P.2d 430 (1931); Sioux City v. Western Asphalt Paving Corporation, 223 Iowa 279, 271 N.W. 624 (1937); In re Puget Sound Power & Light Co., 18 F.2d 57 (C.C.A. 9th Cir. 1927).

In order that the parties, appellant and appellee, may further test the disqualification of the Justices of this Court by application for writ of error in the Supreme Court of Texas, permission is here granted to all parties for leave to amend their briefs to raise by point or cross-point of error the disqualifications of the Justices of this Court. Leave is hereby granted for the parties to amend their briefs within fifteen (15) days to raise such point as a point of error in a motion for rehearing.