# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-08-00793-CV

**Public Utility Commission of Texas; and Electric Transmission Texas, LLC, Appellants**

**v.**

**Cities of Harlingen, McAllen, Mission, Port Lavaca, Rockport, and Victoria;
State of Texas; and Texas Industrial Energy Consumers, Appellees**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 345TH JUDICIAL DISTRICT
### NO. D-1-GV-08-000253, HONORABLE DARLENE BYRNE, JUDGE PRESIDING

## O P I N I O N

This case involves an administrative appeal challenging an order of the Public Utility Commission of Texas approving the application of Electric Transmission Texas, LLC (ETT) for regulatory approval of (1) ETT's formation transactions, (2) the transfer to ETT of certain transmission equipment held under another utility's certificate of convenience and necessity (CCN), and (3) ETT's initial rates. Prior to the administrative proceeding, ETT did not possess a CCN under which it could provide service to the public as an electric utility pursuant to the Public Utility Regulatory Act (PURA).[1] Following the Commission's order, ETT was approved to become an electric utility that provided only transmission-related services.

---

[1] Tex. Util. Code Ann. §§ 11.001-66.016 (West 2007 & Supp. 2009).

The district court found that the Commission exceeded its statutory authority by granting a CCN to ETT, and reversed the Commission's order. The district court also found that the Commission erred by denying the municipalities that had intervened in the proceeding any of their expenses, and the court remanded the case to the Commission for a redetermination of the municipalities' reasonable expenses pursuant to PURA section 33.023.

The Commission and ETT appeal the district court's judgment. We hold that the Commission acted within its statutory authority in granting a CCN to ETT, and in approving the transfer to ETT of rights obtained under a CCN pursuant to PURA section 37.154 without requiring compliance with the provisions of section 37.056. We also hold that the Commission's approval of the underlying formation transactions is supported by substantial evidence. However, we conclude that the Commission erred in determining that it was prohibited from granting the intervening municipalities reimbursement of their reasonable expenses. Consequently, we affirm the judgment of the district court as to its remand of the case for the Commission's reconsideration of whether to reimburse the municipalities for their expenses, and we reverse the remainder of the judgment of the district court and render judgment that the Commission's final order is otherwise affirmed.

*Factual and Procedural Background*

ETT filed an application with the Public Utility Commission in January 2007, seeking regulatory approvals needed to commence operations. ETT sought to become an electric utility whose activities would be limited to acquiring, constructing, owning, and operating transmission facilities within the state overseen by the Electric Reliability Council of Texas (ERCOT). Transmission for purposes of this proceeding involves transporting electricity over power lines at

2

higher voltage. ETT would be owned in equal 50% shares by subsidiaries of American Electric Power Company, Inc. and MidAmerican Energy Holdings Company. American Electric Power's investment was to include the transmission assets to be transferred, which had been constructed and were operated by its subsidiary AEP Texas Central Company (TCC) under an existing CCN, and MidAmerican was to contribute a comparable amount of cash to capitalize the venture. The facilities and related rights that would initially be transferred, subject to ETT's application, were not yet in TCC's rates.

ETT applied to the Commission for a CCN to provide service as an electric utility in Texas, *see* Tex. Util. Code Ann. § 37.051(a) (West 2007), for approval of the transactions to form, capitalize, and structure ETT, *see id.* § 14.101 (West 2007), and for approval of ETT's initial rates for transmission service, *see id.* § 36.001 (West 2007).[2] Appellees—the Cities of Harlingen, McAllen, Mission, Port Lavaca, Rockport, and Victoria (the "Cities"), Texas Industrial Energy Consumers (TIEC), and the State of Texas—separately intervened in the proceeding, contesting portions of ETT's application.

On December 21, 2007, the Commission on rehearing issued its final order on ETT's application. The Commission found that the PURA contemplates the certification of a utility providing only transmission services. The Commission also found that, although ETT had originally requested a CCN in its application pursuant to PURA section 37.056, which governs the grant of a CCN, *see id.* § 37.056 (West 2007), it was more appropriate to apply PURA section 37.154, which

---

[2] ETT's application was filed and approved prior to the 2009 legislative session, and therefore, our review of sections 37.051 and 37.151 of the PURA is in accordance with the pre-2009 versions of those statutes.

governs the transfer of a CCN, *see id.* § 37.154 (West 2007). The Commission then granted ETT's application for the transfer to ETT of TCC's right to operate the initial facilities under the existing CCN in accordance with section 37.154, and approved ETT's formation transactions as in the public interest taking into consideration the factors set out in PURA section 14.101. In addition, the Commission set ETT's initial rates, granted ETT's request for expense reimbursement, and denied the Cities' request for reimbursement of their expenses incurred in connection with the proceeding.[3]

Appellees the Cities, TIEC, and the State separately sought review of the Commission's order in district court, and the causes were consolidated by request of the parties. ETT intervened in the case in support of the Commission's final order. Appellees challenged the transfer of the CCN by asserting that a utility which provides only transmission services and, therefore, which has no certificated service area cannot obtain a CCN under the PURA, that a utility without a preexisting CCN cannot receive by transfer rights obtained under another utility's CCN unless the requirements of PURA section 37.056 are satisfied, and that approval of the transfer under section 37.154 despite the application's citing only sections 37.051 and 37.056 was a violation of appellees' right to due process and was outside of the Commission's subject-matter jurisdiction. Appellees also challenged the approval of ETT's formation transactions, asserting that the Commission's determination that the transactions satisfied PURA section 14.101 was not supported by substantial evidence. Lastly, the Cities challenged the Commission's denial of their request for reimbursement of expenses.

---

[3] One of the three PUC commissioners dissented to the disallowance of reimbursement of the Cities' expenses.

4

On October 8, 2008, the district court issued its judgment in favor of appellees, reversing the Commission's order. The judgment contains the following findings:

(1) the primary issues the Court considered in issuing this Order relate to questions of statutory construction and procedural due process and are therefore reviewed de novo;

(2) the Public Utility Commission ("PUC") exceeded its statutory authority by granting Electronic [sic] Transmission Texas, LLC ("ETT") a certificate of convenience and necessity ("CCN") pursuant to the Public Utility Regulatory Act, Tex. Utilities Code § 37.154 ("PURA") instead of analyzing the request for a CCN pursuant to PURA §§ 37.051 and 37.056, the relevant statutes;

(3) the PUC violated the Plaintiffs' due process rights when it granted ETT a CCN based on PURA § 37.154 when such basis was not pled or raised by the PUC or ETT until after the close of evidence below;

(4) the PUC exceeded its statutory authority and lacked subject matter jurisdiction by granting ETT a CCN based on PURA § 37.154 while accepting jurisdiction over the case based on different statutes, PURA §§ 37.051 and 37.056;

(5) the PUC exceeded its statutory authority in granting a CCN to ETT, a transmission-only utility without a service area; and further

(6) the PUC exceeded its statutory authority in denying the City Plaintiffs any of their reasonable rate case expenses pursuant to PURA § 33.023.

In accordance with these six findings, the district court remanded the case to the agency for action consistent with the court's opinion and "for a determination and award of the Cities' reasonable rate case expenses, if any, pursuant to PURA § 33.023." In addition, the district court expressly declined to rule on the issue of whether substantial evidence supported the Commission's findings under PURA section 14.101.

Appellants—the Commission and ETT—appeal the judgment of the district court, specifically challenging paragraphs (2) through (6). In the event that we affirm the district court's judgment as to paragraphs (2) through (5), ETT further requests that we clarify the scope of remand to the Commission. In the event that we reverse the district court's judgment as to paragraphs (2) through (5), appellees request that we remand the case for the district court to perform the substantial evidence review that the district court had deemed unnecessary based on its findings.

***Transmission-Only Utilities Without a Service Area***

The district court, in paragraph (5) of its judgment, found that the Commission "exceeded its statutory authority in granting a CCN to ETT, a transmission-only utility without a service area." Appellants argue that, for a utility to obtain a CCN, the PURA does not require that the utility provide any services in addition to transmission services, or that such a utility have a certificated service area.

Statutory construction presents a question of law that we review de novo. *See State v. Shumake*, 199 S.W.3d 279, 284 (Tex. 2006). An agency may exercise those specific powers that the law confers upon it in clear and express language, including whatever powers are reasonably necessary to fulfill a function or perform a duty expressly placed in the agency. *Public Util. Comm'n v. GTE-Southwest, Inc.*, 901 S.W.2d 401, 407 (Tex. 1995) (citing *Kawasaki Motors v. Motor Vehicle Comm'n*, 855 S.W.2d 792, 797 (Tex. App.—Austin 1993, writ denied)). The agency may not, however, erect and exercise what really amounts to a new and additional power or one that contradicts the statute, regardless of how expedient the new power may be for administrative

6

purposes. *Id.* (citing *Sexton v. Mount Olivet Cemetery Ass'n*, 720 S.W.2d 129, 137-38 (Tex. App.—Austin 1986, writ ref'd n.r.e.)).

The applicable definitions in the PURA contemplate that a utility may be a transmission-only utility. The PURA defines an "electric utility" in general to include a person "that owns or operates for compensation in this state equipment or facilities to produce, generate, transmit, distribute, sell, or furnish electricity in this state." Tex. Util. Code Ann. § 31.002(6) (West 2007). This definition does not require that an electric utility provide a service in addition to transmission. *See id.* Similarly, the PURA defines a "transmission and distribution utility" (TDU) in general as "a person or river authority that owns or operates for compensation in this state equipment or facilities to transmit or distribute electricity." *Id.* § 31.002(19). The definition does not require a TDU to provide transmission *and* distribution services. *See id.* ETT, therefore, by obtaining equipment or facilities in this state to transmit electricity, by definition became an electric utility and a TDU. *See id.* § 31.002(6), (19).[4]

Appellees argue that, regardless of whether a transmission-only utility qualifies as an electric utility and a TDU, the Commission does not have statutory authority to grant a CCN to such a utility. In order to provide service to the public, an electric utility must obtain from the Commission a CCN—a "certificate that states that the public convenience and necessity requires

---

[4] Section 39.051 of the PURA provides further evidence that transmission and distribution may be provided by separate entities. As part of the transition to competitive retail market, each electric utility was required to separate its business activities into a power generation company, a retail electric provider, and a transmission and distribution utility. *See* Tex. Util. Code Ann. § 39.051(b) (West 2007). As to that process of separation, section 39.051 specifically provides that the electric utility "may create separate transmission and distribution utilities." *Id.* § 39.051(c).

7

or will require the installation, operation, or extension of the service." *Id.* § 37.051(a). Appellees contend that the sections of the PURA governing a utility's receipt of a CCN—sections 37.056 and 37.154—are inconsistent with the certification of a transmission-only utility. Section 37.056 of the PURA provides authority for the Commission to grant a CCN, provided that the Commission finds that "the certificate is necessary for the service, accommodation, convenience, or safety of the public." *Id.* § 37.056(a). However, appellees do not offer a persuasive explanation as to why a transmission-only utility could not satisfy this requirement. As an alternative method for a utility to obtain a CCN, section 37.154 of the PURA provides that an "electric utility may sell, assign, or lease a certificate or a right obtained under a certificate if the commission determines that the purchaser, assignee, or lessee can provide adequate service." *Id.* § 37.154(a). Again, appellees do not offer a persuasive explanation as to why a transmission-only utility could not "provide adequate service." Based on the plain language of sections 37.056 and 37.154, each of which provides the Commission authority to approve a utility's receipt of a CCN, the Commission has been given the power to approve a CCN for a utility that provides only transmission services, provided that such services meet the applicable standards.

Appellees express concern that a transmission-only utility is "a type never before seen in Texas," and indicate that for such a utility to be statutorily authorized to obtain a CCN, the above-cited statutes would need to expressly reference a transmission-only utility. However, none of the above-cited statutes expressly references *any* specific type of utility. *See id.* §§ 37.051(a), .056(a), .154(a). If a specific statutory reference to a particular type of utility were necessary to authorize the Commission to issue a CCN, no utility would be statutorily authorized to obtain a CCN because

8

there would be no corresponding statutory reference to the specific type that the applying utility happened to be. Such an interpretation of these statutes is not consistent with the purpose of the statutory scheme and would lead to an unreasonable result. *See* Tex. Gov't Code Ann. § 311.021(3) (West 2005) (for statutory construction, presumption that just and reasonable result intended). Therefore, the fact that a utility provides only transmission services cannot, by itself, reduce the Commission's statutory authority to grant a CCN to that utility.[5]

Appellees also argue that because a transmission-only utility, unlike one that also provides distribution services, would generally not have a defined geographic area to which it provided service, such a utility cannot obtain a CCN. Appellees rely on PURA section 37.151 to support the district court's finding that a utility is obligated to service a specified, geographic area in order to obtain a CCN. Section 37.151 provides that a certificate holder shall "serve every consumer in the utility's certificated area" and "provide continuous and adequate service in that area." Tex. Util. Code Ann. § 37.151 (West 2007). According to appellees, these requirements constitute mandates that a utility have a certificated area. In contrast, under the Commission's

[5] Moreover, there are circumstances in which transmission-only utilities are specifically provided for by statute. For example, according to testimony before the Commission in connection with ECC's application, the Lower Colorado River Authority is an existing utility operating transmission lines. The Texas Water Code provides that a river authority may "provide transmission services, as defined by the Utilities Code or the Public Utility Commission of Texas," *see* Tex. Water Code Ann. § 152.301(a) (West 2004), and yet such statutory authority does not relieve a river authority from "an obligation to comply with each provision of the Utilities Code concerning a certificate of convenience and necessity for a transmission facility," *see id.* § 152.302(2) (West 2004). Under appellees' statutory interpretation that the PURA does not authorize the grant of a CCN to a utility that provides only transmission services, water code section 152.302 would bar a river authority from providing the very transmission services that are authorized by water code section 152.301.

9

interpretation, section 37.151's requirements regarding the scope and quality of the service provided are applicable only *to the extent* the certificate holder has a certificated area.

"Construction of a statute by the administrative agency charged with its enforcement is entitled to serious consideration, so long as the construction is reasonable and does not contradict the plain language of the statute." *Tarrant Appraisal Dist. v. Moore*, 845 S.W.2d 820, 823 (Tex. 1993). Under the Commission's interpretation of PURA section 37.151, any utility that has a certificated area—whether by obligation or at its discretion—must serve every customer and provide adequate service therein, but a utility without a certificated area would not be subject to such certificated-area-related requirements. Considering the plain language of section 37.151, we are persuaded that the Commission's interpretation is reasonable. *See Shumake*, 199 S.W.3d at 284 (stating that legislative intent is discerned, when possible, from the plain meaning of the words chosen in the statute). Section 37.151 does not state that a certificate holder shall have a certificated area, or that it shall serve customers in *a* certificated area. *See* Tex. Util. Code Ann. § 37.151. Rather, section 37.151 provides that the certificate holder shall serve the customers in "the utility's certificated area"—i.e. if the utility has a certificated area. *See id.*

Interpreting section 37.151 not to provide an independent requirement that an electric utility have a defined service area before being eligible for a CCN is consistent with the distinction between transmission services and distribution services. Transmission services involve the transportation of power at higher voltage. *See* 16 Tex. Admin. Code § 25.5(140), (144) (2009). Distribution services involve carrying power from the transmission system to end users over lower-voltage lines. *See id.* § 25.5(31), (33). While distribution services may be provided to

10

retail customers—the separately metered end-use customers who purchase and ultimately consume electricity, *see* Tex. Util. Code Ann. § 31.002(16)—a retail customer cannot be a transmission service customer. *See* 16 Tex. Admin. Code § 25.5(142). Instead, transmission service customers include such entities as distribution service providers, municipally-owned utilities, retail electric providers, and also other transmission service providers. *See id.* We find no expression of legislative intent in the PURA that such customers of a particular transmission service provider be limited to a particular geographic area, particularly since the PURA contemplates that transmission service providers broadly offer "wholesale transmission services within ERCOT." *See* Tex. Util. Code Ann. § 35.004(d) (West 2007). Therefore, we consider it a reasonable interpretation of the PURA that section 37.151 does not require a transmission-only utility to have a service area, but instead requires simply that utilities that do have a service area—as would be the case, for example, with a utility that provides distribution services to retail customers, *see id.* § 37.051(b)—comply with certain mandates within that service area.

Appellees also refer to PURA section 37.056 to argue that an electric utility must have a service area to obtain a CCN. Section 37.056 sets out factors that the Commission is to consider in determining whether to grant a CCN. *See id.* § 37.056(c). These factors include "the effect of granting the certificate on the recipient of the certificate and any electric utility serving the proximate area" and "the probable improvement of service or lowering of cost to consumers in the area if the certificate is granted." *See id.* § 37.056(c)(3), (4)(E). However, neither factor specifically refers to a "service area" or a "certificated area." In *Hammack v. Public Utility Commission*, the Commission had granted a CCN for the construction of a transmission line and,

11

in doing so, had stated that "the focus should not be limited to the needs of an isolated geographic area, but instead should consider the needs of the interconnected statewide transmission systems." 131 S.W.3d 713, 722 (Tex. App.—Austin 2004, pet. denied). This Court held that, in light of the applicable statutory scheme, the Commission did not improperly apply PURA section 37.056 in taking into account such statewide considerations. *See id.* at 724. This suggests, then, that when granting a CCN under section 37.056 to a utility providing transmission services, the "proximate area" under consideration is not limited to the particular geographic area in which the transmission facility is located, even if the utility provides distribution services to a certificated area. It follows that section 37.056 does not support appellees' position that a transmission-only utility cannot be certified without a defined service area. Consequently, we hold that the Commission has been conferred power under the PURA to grant a CCN to a transmission-only utility that does not have a certificated service area.[6]

We note that both sides have argued that their positions are supported by policy considerations. Appellants contend that if only TDUs certificated to provide distribution services are able to provide transmission services, the Commission will be unable to carry out its legislative mandate to increase the statewide, renewable energy technology generating capacity. *See generally* Tex. Util. Code Ann. § 39.904 (West Supp. 2009). Appellees counter that there are "more than enough" existing, certificated TDUs that are "ready, willing and able" to provide all of the transmission needed to satisfy the state's renewable energy goals. A number of amici curiae,

---

[6] Our holding is only that a transmission-only utility can obtain a CCN without a "certificated area." We do not consider whether an electric utility that provides any services other than transmission can obtain a CCN without a "certificated area."

12

including wind generation developers and transmission-only utilities without service areas that have applied for CCNs from the Commission, have also filed briefs, arguing on the side of appellants.

We do not express an opinion on the policy considerations expressed by the parties and the various amici curiae, however, because the Texas Legislature has spoken to the issue by enacting House Bill 3309 during the 2009 regular session. As to the issue of whether a transmission-only utility can obtain a CCN, the following subsection (d) was added to PURA section 37.051: "A certificate may be granted to an electric utility or other person under this section for a facility used as part of the transmission system serving the ERCOT power region solely for the transmission of electricity." Act of May 31, 2009, 81st Leg., R.S., ch. 1170, § 2, 2009 Tex. Gen. Laws 3702, 3703 (codified at Tex. Util. Code Ann. § 37.051(d) (West Supp. 2009)). Furthermore, as to whether such a utility can obtain a CCN when it has no specific certificated area, the following italicized language was added to PURA section 37.151:

> Except as provided by this section, Section 37.152, and Section 37.153, a certificate holder*, other than one granted a certificate under Section 37.051(d)*, shall:
>
> (1)     serve every consumer in the utility's certificated area; and
>
> (2)     provide continuous and adequate service in that area.

*Id.* § 4 (codified at Tex. Util. Code Ann. § 37.151 (West Supp. 2009)). The Texas Legislature has clarified, therefore, that an electric utility intending to operate a facility that is part of the transmission system serving the ERCOT power region may obtain a CCN even if the utility will

provide only transmission services and will not satisfy section 37.151's certificated-area-related requirements.[7]

We conclude that the district court erred in holding that the Commission exceeded its statutory authority in granting a CCN to "a transmission-only utility without a service area." The PURA authorizes the Commission to grant a CCN to an electric utility that provides only transmission services and that does not have a certificated area in which such services will be provided. *See* Tex. Util. Code Ann. §§ 31.002(6), 37.056(a), .154(a).

### Transfer of CCN under PURA Section 37.154

Appellants also argue that the district court erred in holding that the Commission's granting a CCN to ETT under section 37.154 was improper. On this issue, appellants challenge paragraphs (2), (3), and (4) of the district court's judgment.

#### Transferee with no pre-existing CCN

The district court, in paragraph (2) of its judgment, found that the Commission "exceeded its statutory authority by granting [ETT] a [CCN] pursuant to [PURA] § 37.154 . . .

---

[7] In the absence of some showing, either by legislative history or otherwise, that the intent of the legislature in adopting the amendment was to clarify rather than change the statute in question, the presumption is of change rather than clarification. *Williamson Pointe Venture v. City of Austin*, 912 S.W.2d 340, 345 (Tex. App.—Austin 1995, no pet.). We note that the bill analysis for House Bill 3406, which contains the amendments to PURA sections 37.051 and 37.151 that were later added to the existing House Bill 3309, references the district court's findings in this case and provides that the legislation "clarifies" the Commission's authority to issue CCNs to "new owners and operators of certain wholesale electric transmission facilities that do not have traditional utility 'service areas.'" *See* House Comm. on State Affairs, Bill Analysis, Tex. H.B. 3406, 81st Leg., R.S. (2009).

14

instead of analyzing the request for a CCN pursuant to PURA §§ 37.051 and 37.056, the relevant statutes." Appellants contend that the Commission correctly determined that PURA section 37.154 was the proper statute for granting the CCN requested by ETT in its application.

An electric utility may not directly or indirectly provide service to the public under a franchise or permit unless the utility first obtains a CCN from the Commission. *See id.* § 37.051(a). ETT sought to become an electric utility and obtain a CCN not by installing or operating a new service, but by acquiring and operating transmission equipment already constructed by TCC under an existing CCN. PURA section 37.154 governs transfers of CCNs and transfers of rights obtained under a CCN. Section 37.154 provides that "[a]n electric utility may sell, assign, or lease a certificate or a right obtained under a certificate if the commission determines that the purchaser, assignee, or lessee can provide adequate service." *Id.* § 37.154(a).[8] Thus, the focus is on the ability of the transferee to provide adequate service, not on the necessity for the service itself. *See id.* PURA section 14.101 provides additional requirements regarding transfers that exceed certain thresholds. *See id.* § 14.101. In certain cases, the Commission must determine whether the transaction is consistent with the public interest, and may disallow the transaction if it will unreasonably affect rates or service. *See id.* § 14.101(b), (c). Under both sections 37.154 and 14.101, there is no necessity requirement applied to the services permitted under the transferred certificate, to the transfer itself, or to the transferee being the party providing the services. *See id.*

---

[8] Section 37.154 also provides that "[a] sale, assignment, or lease of a certificate or a right is subject to conditions the commission prescribes." Tex. Util. Code Ann. § 37.154(b) (West 2007). No allegation has been made in this suit that the approved transfer to ETT violated any conditions prescribed by the Commission.

15

§§ 14.101, 37.154. Instead, the focus is on whether services will *continue* to be adequately provided following the transfer. *See id.* §§ 14.101(c), 37.154(a).

The determination of whether the services provided under a CCN are necessary is made when the CCN is initially obtained, or when additional services are added to the existing CCN. *See, e.g.*, *Dunn v. Public Util. Comm'n*, 246 S.W.3d 788, 790-91 (Tex. App.—Austin 2008, no pet.) (extension of service under existing CCN); *Public Util. Comm'n v. Texland Elec. Co.*, 701 S.W.2d 261, 263, 265-66 (Tex. App.—Austin 1985, writ ref'd n.r.e.) (appellee's application for new CCN). This determination is made under PURA section 37.056. *See Dunn*, 246 S.W.3d at 791-92; *Texland Elec. Co.*, 701 S.W.2d at 266. Section 37.056 sets out the considerations by which the Commission determines whether to "grant" a CCN. *See* Tex. Util. Code Ann. § 37.056. The provisions of section 37.056 indicate that its focus is on new services, not new providers of a service. *See id.*[9] Thus, we are convinced that the Commission's interpretation, that when a transfer occurs in which no new services are contemplated there is no need to comply with section 37.056, is reasonable. No determination need be made regarding the necessity of existing services, because such determination would have already been made by the Commission in order for the transferor to have obtained its CCN in the first place. A CCN does not need to be "re-granted"—in accordance

---

[9] Subsection (a) of PURA section 37.056, which states the general test regarding whether the Commission may grant a CCN, requires that the CCN be "necessary for the service, accommodation, convenience, or safety of the public." *See id.* § 37.056(a) (West 2007). Subsection (c), which lists specific considerations involved in the Commission's determination, requires consideration of, among other factors, the adequacy of existing service and the need for additional service. *See id.* § 37.056(c).

16

with the requirements of section 37.056—when all rights to be obtained by the transferee have already been approved by the Commission in connection with the transferor's preexisting CCN.[10]

Appellees contend that a transferee cannot obtain by transfer a CCN or rights obtained under the CCN unless the transferee already possesses its own CCN. Section 37.154 contains no such requirement, but instead refers to the transferee generally as "the purchaser, assignee, or lessee." *See id.* § 37.154(a). Appellees point to the requirement in section 37.051 that the utility obtain a CCN "from the commission." *See id.* § 37.051(a). However, under the plain language of section 37.154, for a transfer to take place the Commission must provide its approval. *See id.* § 37.154(a). We consider such Commission action to be sufficient to satisfy section 37.051's requirement that a utility obtain a CCN from the Commission. Otherwise, under appellees' interpretation, no new utility could enter the market by purchasing existing service. It would have to wait until a need for new service arose somewhere, and then obtain a new CCN directly from the Commission to provide that service.

Appellees also assert that to grant a CCN to a utility, the Commission must determine not only that the service is necessary, but that the utility itself is necessary to provide such service. Appellees conclude, based on this assertion, that ETT would need to satisfy section 37.056 in this case because the Commission has not yet determined that there is a public need for ETT. However, appellees provide no authority for their assertion. Under section 37.051, to obtain a CCN,

---

[10] Appellees contend that ETT obtained certain facilities by transfer that were not subject to TCC's existing CCN. To the extent that ETT intends to provide service to the public in a manner that requires a CCN from the Commission and the CCN obtained by the transfer at issue in this case does not encompass such service, ETT would need to obtain a new CCN or amend its existing CCN in accordance with PURA sections 37.051 and 37.056.

17

public convenience and necessity must require "the installation, operation, or extension of the service," not the utility itself. *See id.* § 37.051(a). Likewise, section 37.056 requires that "the certificate," rather than the utility itself, be found necessary. *See id.* § 37.056(a). While a review under section 37.056 of the service to be provided under the CCN would presumably encompass whether the utility seeking the CCN could adequately provide that service, *see id.* § 37.056(c)(4)(E), this concern is in fact addressed in section 37.154(a), because in order to approve a transfer the Commission must determine that the transferee "can provide adequate service," *see id.* § 37.154(a).

Therefore, we affirm the Commission's conclusion that when a CCN or rights obtained thereunder are transferred in accordance with PURA section 37.154, and no additional service is to be installed, operated, or extended in connection with such transfer, the requirements of PURA section 37.056 do not apply. Instead, the transfer must satisfy section 37.154 and, if applicable, the additional statutory restrictions under section 14.101. *See id.* §§ 14.101, 37.154; *see also Cities of Austin v. Southwestern Bell Tel. Co.*, 92 S.W.3d 434, 441-42 (Tex. 2002) ("[W]e give weight to how the PUC interprets its own powers, but only if that interpretation is reasonable and not inconsistent with the statute.").

*Due process considerations*

The district court, in paragraph (3) of its judgment, found that the Commission "violated the Plaintiffs' due process rights when it granted ETT a CCN based on PURA § 37.154 when such basis was not pled or raised by the [Commission] or ETT until after the close of evidence below." In its application with the Commission, ETT did not cite section 37.154 of the PURA. ETT

18

did not categorize its application as requesting a transfer under section 37.154 until its initial post-hearing brief.

In order to raise in the district court a complaint of denial of due process by the Commission, appellees were required to raise the complaint in their motions for rehearing before the Commission. *See Gonzalez v. Texas Educ. Agency*, 882 S.W.2d 526, 528 (Tex. App.—Austin 1994, no writ). A motion for rehearing must be sufficiently definite to apprise the agency of the error claimed and to allow the agency opportunity to correct or otherwise address the error. *See Suburban Util. Corp. v. Public Util. Comm'n*, 652 S.W.2d 358, 365 (Tex. 1983); *Entergy Gulf States, Inc. v. Public Util. Comm'n*, 173 S.W.3d 199, 210 (Tex. App.—Austin 2005, pet. denied). We find no reference, in the Cities' and TIEC's motions for rehearing, to their right to due process or ETT's failure to plead or raise PURA section 37.154. Appellees argue that the State sufficiently raised the issue of due process in the following language of its motion for rehearing:

> Instead of making a principled decision pursuant to PURA §§ 37.051 and 37.056, the Commission through its Order apparently intends to approve the transfer of a portion of TCC's *rights* under its own certificate to ETT. . . .
>
> . . . . Nothing in [§ 37.154] implies that TCC (or any other utility) may be permitted to transfer a portion of its rights to a non-certificated entity such as ETT, or that the mere transfer (or purported transfer) of TCC's rights under its own certificate can somehow create a new certificated utility within the meaning of PURA § 37.051. The Commission's decision, made without reference to any guiding principles of law, is thus arbitrary and capricious and an abuse of discretion.

This language does not sufficiently identify appellees' right to due process or ETT's failure to plead or raise PURA section 37.154. The motion for rehearing apprised the Commission of the State's allegation that PURA section 37.154 does not authorize the Commission's decision,

19

but did not sufficiently apprise the Commission that the State was alleging surprise or harm from the very fact that section 37.154 was even considered by the Commission. By failing to raise a due process issue in their motions for rehearing, appellees waived the issue. *See Gonzalez*, 882 S.W.2d at 528. The district court's finding that the Commission violated appellees' rights to due process was, therefore, error.

*Commission's subject-matter jurisdiction*

The district court found, in paragraph (4) of its judgment, that the Commission "lacked subject matter jurisdiction by granting ETT a CCN based on PURA § 37.154 while accepting jurisdiction over the case based on different statutes, PURA §§ 37.051 and 37.056." In its application with the Commission, ETT asserted that the Commission "has jurisdiction over this application under §§ 14.101, 35.004, 36.001, and 37.056 of PURA." The Commission, in turn, included a conclusion of law in its final order stating, "The Commission has jurisdiction over ETT, TCC and the subject matter of its application under PURA §§ 14.101, 35.004, 36.001 and 37.056."

Appellees contend that because ETT did not cite PURA section 37.154 in its application's statement of jurisdiction and the Commission never specifically "took" jurisdiction pursuant to section 37.154, the Commission did not have jurisdiction to grant a transfer under section 37.154. As with appellees' complaint of denial of due process, appellees failed to raise the issue of lack of subject-matter jurisdiction before the Commission. However, failure to exhaust administrative remedies does not bar judicial review when the error alleged is that the agency acted without subject-matter jurisdiction. *See City of Sherman v. Public Util. Comm'n*, 643 S.W.2d 681, 683 (Tex. 1983).

20

The parties do not dispute that the Commission has jurisdiction to approve the transfer of a CCN or rights obtained thereunder pursuant to PURA section 37.154. *See* Tex. Util. Code Ann. § 37.154. The question is whether the failure to cite section 37.154 by ETT in the statement of jurisdiction in its application for a CCN, or by the Commission in its conclusion of law regarding its jurisdiction, results in the Commission lacking jurisdiction to act under that section. Appellees cite no authority holding that the omission of a reference to a statute from an application's statement of jurisdiction results in a bar against any action taken by the applicable agency under that statute. To the contrary, under the Commission's rules:

> When issues not raised by the pleadings are tried or otherwise heard or argued at hearing by express or implied consent of the parties, upon a determination by the presiding officer that no prejudice to any of the parties will occur, the issues shall be treated in all respects as if they had been raised in the pleadings.

16 Tex. Admin. Code § 22.76(b) (2009). ETT's application described the proposed transfer of transmission facilities from TCC to ETT, and requested a CCN in accordance with PURA section 37.051(a) so that ETT could operate such facilities. Moreover, the administrative record reflects that, while section 37.154 was not referenced in ETT's application, the parties argued the applicability of section 37.154 and appellees did not allege any prejudice resulting from the Commission's consideration of the statute. Under these circumstances, we decline to hold that the Commission had no jurisdiction over a section 37.154 transfer based only on ETT's failure to cite section 37.154 in its application's statement of jurisdiction.

In the same way, we conclude that the absence of a reference to section 37.154 in the Commission's conclusion of law regarding jurisdiction, by itself, does not deprive the Commission

21

of jurisdiction to act pursuant to that section. Again, appellees have cited no authority that would support a conclusion to the contrary. We are not to subject an agency's order to a "hypertechnical" standard of review. *See State Banking Bd. v. Allied Bank Marble Falls*, 748 S.W.2d 447, 448-49 (Tex. 1988); *Gene Hamon Ford, Inc. v. David McDavid Nissan, Inc.*, 997 S.W.2d 298, 310-12 (Tex. App.—Austin 1999, pet. denied). The Commission's order includes a finding of fact that "ETT can provide adequate service in accordance with PURA § 37.154," a conclusion of law that TCC's sale and assignment of its right under the existing CCN is "granted because ETT can provide adequate service," and an ordering paragraph granting ETT a CCN "by transfer of rights." Thus, the Commission's order, as a whole, expressly contemplates the exercise of its jurisdiction in approving a transfer pursuant to section 37.154 of the PURA. To find jurisdiction lacking based solely on the absence of a reference to section 37.154 in the single conclusion of law regarding the Commission's jurisdiction would require us to apply the type of "hypertechnical" review that this Court has found improper. *See Gene Hamon Ford*, 997 S.W.2d at 312.

Therefore, the Commission properly construed and applied PURA section 37.154. We hold that the Commission is authorized to transfer a CCN or rights obtained thereunder pursuant to section 37.154 without considering the section 37.056 factors as to the CCN or rights being transferred or requiring the transferee to possess a CCN prior to the transfer. We also hold that the Commission's transfer to ETT of rights and facilities held by TCC pursuant to section 37.154 was not an action taken without subject-matter jurisdiction, and that whether such transfer violated appellees' rights to due process was not an issue properly preserved for judicial review.

22

*Substantial Evidence Review*

Appellees' pleadings include a claim that the Commission's determination that ETT's formation transactions complied with PURA section 14.101 is not supported by substantial evidence. Based on the district court's findings in paragraphs (2) through (5) of its judgment, the court reversed the Commission's approval of ETT's application and deemed it unnecessary to perform the requested substantial evidence review. In the preceding sections of this opinion, we have concluded that paragraphs (2) through (5) of the district court's judgment were error. As a result, appellants' claim that substantial evidence does not support the Commission's determination that ETT's formation transactions complied with PURA section 14.101 is ripe for consideration.

Appellees contend that remand to the district court is the proper course, so that the district court may perform the substantial evidence review that is required by the applicable claim in appellees' pleadings. However, whether substantial evidence supports an administrative agency's decision is a question of law. *See Texas Dep't of Pub. Safety v. Alford*, 209 S.W.3d 101, 103 (Tex. 2006). Therefore, had the district court ruled on this claim in its judgment, its ruling would be entitled to no deference on appeal. *See id.* Also, no evidence in addition to the administrative record is required. "When reversing a trial court's judgment, the court must render the judgment that the trial court should have rendered, except when: (a) a remand is necessary for further proceedings; or (b) the interests of justice require a remand for another trial." Tex. R. App. P. 43.3. Given that the issue not decided by the district court is a question of law, we consider remand to the district court to be unnecessary, and we will rule on the issue so that we may render the judgment that the district court should have rendered.

23

Judicial review of a final order of the Commission generally is under the substantial evidence standard of review. *See* Tex. Util. Code Ann. § 15.001 (West 2007). We presume that the Commission's findings are supported by substantial evidence, and appellees have the burden to demonstrate otherwise. *See ASAP Paging, Inc. v. Public Util. Comm'n*, 213 S.W.3d 380, 392 (Tex. App.—Austin 2006, pet. denied). Substantial evidence requires only more than a mere scintilla, and the evidence on the record actually may preponderate against the agency's decision and nonetheless amount to substantial evidence. *Railroad Comm'n v. Torch Operating Co.*, 912 S.W.2d 790, 792-93 (Tex. 1995). We may not substitute our judgment for that of the agency on the weight of the evidence. *ASAP Paging*, 213 S.W.3d at 392. The test is not whether in our view the agency reached the correct conclusion but whether some reasonable basis exists in the record for the agency's action. *Id.* at 393.

The parties agree that the following provisions of PURA section 14.101 applied to the transfer of TCC's initial facilities to ETT, and to the transfer of ownership interests in ETT:

> [T]he commission shall investigate the transaction, with or without a public hearing, to determine whether the action is consistent with the public interest. In reaching its determination, the commission shall consider:
>
> (1) the reasonable value of the property, facilities, or securities to be acquired, disposed of, merged, transferred, or consolidated;
>
> (2) whether the transaction will:
>
> (A) adversely affect the health or safety of customers or employees;
>
> (B) result in the transfer of jobs of citizens of this state to workers domiciled outside this state; or
>
> (C) result in the decline of service;

24

(3)  whether the public utility will receive consideration equal to the reasonable value of the assets when it sells, leases, or transfers assets; and

(4)  whether the transaction is consistent with the public interest.

Tex. Util. Code Ann. § 14.101(b).

At the district court, only the State argued that substantial evidence did not support the Commission's determination that ETT's formation transactions complied with PURA section 14.101.  The State argued that the transfer of assets would provide no improvement of service, and yet would result in rate case expenses charged to customers that would not have been incurred if TCC had retained the assets.  For instance, according to the State, if TCC had retained the assets and placed the equipment in its own rate base, the ratemaking proceeding would not have included expenses for litigating the issues of whether ETT could obtain a CCN in accordance with PURA section 37.154 and whether the proposed transactions should be approved in accordance with PURA section 14.101.

We find that substantial evidence supports the Commission's findings.  The Commission issued findings of fact to the effect that it considered subsection (1) of section 14.101(b), and that the transaction at issue satisfied subsections (2) and (3).  Appellees have not challenged these findings.  Instead, the State focused only on whether costs exceeded benefits and thus, according to the State, the transaction failed the "public interest" considerations of subsection (4) of PURA section 14.101(b).  Regarding the costs applicable to the transaction, the Commission determined that ETT's return on equity would not be higher than that of TCC, that

25

ETT's incremental cost of debt would be comparable to that of TCC to construct the same facilities, and that the costs associated with ETT's operation of the facilities were comparable to the costs for TCC to do so.

These findings were supported by testimony by ETT witnesses. According to one ETT witness, for instance, ETT's requested return on equity was the same as that requested in TCC's pending rate case. Similarly, an ETT witness testified regarding ETT's comparable cost of debt based on its current credit rating. Moreover, after the Commission expressed concern that recovery of formation expenses would not be consistent with the public interest, ETT agreed to withdraw its request for recovery of such expenses. Regarding benefits applicable to the transaction, upon completion of the transaction, ETT would apply to become a participant in the Commission's ongoing competitive renewable energy zone process, with the intention of promoting long-term planning and innovative transmission technology for ERCOT, the state-wide transmission grid. *See* Tex. Util. Code Ann. § 39.904(g) (West Supp. 2009). ETT was already a participant in that docket. Also, MidAmerican was to make an initial $15 million investment. While the State characterized the potential for further equity investment in ETT as speculative, ETT presented evidence that substantial future investment was likely. According to ETT testimony, the combination of both American Electric Power's and MidAmerican's technical and financial resources would enable ETT to evaluate and pursue transmission services in ERCOT on a larger geographic and financial scale than TCC would on its own. In addressing the benefit-cost analysis, ETT testimony characterized the transaction as one that "doesn't have downside but has significant upside potential."

Thus, for purposes of a substantial evidence review, there is sufficient evidence in the administrative record to the effect that the consideration for ETT's formation transactions was equal to the reasonable value of the assets transferred, that approval of the transaction would not adversely affect the health or safety of customers or employees, result in the transfer of jobs outside the state, or result in the decline of service, that return on equity, incremental cost of debt, and operational costs were comparable as between TCC and ETT, and that approval of ETT's application would be beneficial given the growing need for transmission of electricity in the state. We, therefore, conclude that substantial evidence supports the determination of the Commission that ETT's formation transactions satisfied the "public interest" factors of PURA section 14.101(b). *ASAP Paging*, 213 S.W.3d at 392.

***Ratemaking Proceeding Expenses***

The district court, in paragraph (6) of its judgment, found that the Commission "exceeded its statutory authority in denying the City Plaintiffs any of their reasonable rate case expenses pursuant to PURA § 33.023." The court remanded the matter to the Commission "for a determination and award of the Cities' reasonable rate case expenses, if any, pursuant to PURA § 33.023." In a separate point on appeal, the Commission argues that its conclusion that the Cities were not entitled to recover expenses in the proceeding should be affirmed on review.

Section 33.023 of the PURA contemplates that municipalities may incur expenses in connection with a ratemaking proceeding, and provides for reimbursement for such expenses.

27

(a) The governing body of a municipality participating in or conducting a ratemaking proceeding may engage rate consultants, accountants, auditors, attorneys, and engineers to:

> (1)  conduct investigations, present evidence, and advise and represent the governing body; and
> > (2)  assist the governing body with litigation in an electric utility ratemaking proceeding before the governing body, a regulatory authority, or a court.

(b)  The electric utility in the ratemaking proceeding shall reimburse the governing body of the municipality for the reasonable cost of the services of a person engaged under Subsection (a) to the extent the applicable regulatory authority determines is reasonable.

Tex. Util. Code Ann. § 33.023 (West 2007).  There is no dispute that ETT is an electric utility, and that the Cities incurred some expenses in obtaining the types of services described by PURA section 33.023(a).  Nonetheless, the Commission contends it was justified in determining that the Cities were not entitled to reimbursement of any such expenses.

In addition to a conclusion of law that the Cities were not entitled to recover their expenses, in the "Discussion" portion of its final order the Commission stated the following with regard to the reimbursement of the Cities' expenses:

> Also at the September 13, 2007 open meeting, the Commission addressed the issue raised by Staff regarding Cities' rate case expenses.  Although Cities urge that they are entitled to rate case expense reimbursement under PURA § 33.023, Staff contend that chapter 33 of PURA does not allow reimbursement of Cities' rate case expenses in a wholesale-only docket such as ETT's.  The Commission requested additional information from Cities regarding the extent to which the rate case expenses requested by Cities were attributable to the rate case component, the sale/merger/transfer component, or the CCN component of this docket.  On September 28, 2007, Cities filed a letter that reiterated Cities' contention that all of the Cities' efforts in this proceeding have been related to ETT's ability to collect rates from the Cities and their citizenry.  The Commission is persuaded by Staff's arguments, including the conclusion that PURA § 33.023 applies only to rate cases

28

where rates for retail services within the city are set, and that cities have no jurisdiction to set wholesale transmission rates. Therefore, Cities are entitled to recover none of their requested rate case expenses in this docket.

The Commission Staff had conceded that the Cities and their residents will ultimately pay some of ETT's costs through its rates, but took the position before the Commission that the Cities' request for recovery of expenses should be denied because PURA section 33.023 "does not apply to these expenses." According to the Commission's order, the Commission based its determination on the Staff's arguments that PURA section 33.023 applies only to rate cases in which rates for retail services within the municipality are set, not those in which only wholesale transmission rates are set, and that municipalities have no jurisdiction to set wholesale transmission rates.

The Commission's construction of PURA section 33.023 is entitled to serious consideration, so long as the construction is reasonable and does not contradict the plain language of the statute. *Tarrant Appraisal Dist.*, 845 S.W.2d at 823. Thus, we look to the plain language of the statute. While section 33.023 limits reimbursement to certain types of services, *see* Tex. Util. Code Ann. § 33.023(a), and to costs that are determined reasonable, *see id.* § 33.023(b), the only restriction concerning the municipality itself is that it be "participating in or conducting a ratemaking proceeding," *see id.* § 33.023(a). *Cf. Southwestern Bell Tel. Co. v. Public Util. Comm'n*, 31 S.W.3d 631, 641 (Tex. App.—Austin 2000) ("[The telecommunications utility] is required to reimburse Cities for their attorney's fees incurred if these proceedings are deemed 'ratemaking proceedings' and if the Commission finds that the costs are reasonable."), *aff'd*, 92 S.W.3d 434 (Tex. 2002).

The Commission in its order set ETT's rates. Thus, the proceeding below was a ratemaking proceeding. *See* Tex. Util. Code Ann. § 11.003(17) (West 2007) (ratemaking proceeding

29

is "proceeding in which a rate is changed"); *Southwestern Pub. Serv. Co. v. Public Util. Comm'n*, 962 S.W.2d 207, 219-20 (Tex. App.—Austin 1998, pet. denied) (ratemaking proceeding is one that directly results in changed rates to customers).[11] In addition, there can be no dispute that the Cities were participating in the proceeding. Section 33.025 provides that a municipality has standing in "each case before the commission that relates to an electric utility providing service in the municipality." *See* Tex. Util. Code Ann. § 33.025(a) (West 2007). The Commission determined that the Cities had standing to participate, and granted their motion to intervene. Moreover, in arguing to the Commission that the Cities' expenses could not be reimbursed, the Commission Staff conceded that the determination on the Cities' standing was correct. Based on the plain language of section 33.023, the Cities were potentially eligible to receive reimbursement to the extent that, under subsection (a), the applicable services were the correct types of services and, under subsection (b), the costs were reasonable in accordance with the Commission's determination. *See id.* § 33.023.

The Commission based its determination that reimbursement was not allowed on the Staff's arguments that municipalities have no jurisdiction to set wholesale transmission rates and that section 33.023 does not apply to rate cases in which only wholesale transmission rates are set. The Staff, in turn, had based both those arguments on provisions of the PURA that address

---

[11] The Commission appears to contend that a proceeding in which rates are set is not a ratemaking proceeding if the setting of rates is not the primary issue in the proceeding. We find no legal authority addressing expense reimbursement in a proceeding involving an electric utility's rates that reflects such a limitation. *See* Tex. Util. Code Ann. §§ 11.003(17), 33.023 (West 2007); *see also Southwestern Pub. Serv. Co. v. Public Util. Comm'n*, 962 S.W.2d 207, 219-20 (Tex. App.—Austin 1998, pet. denied) (holding that ratemaking proceeding directly results in changed rates to customers, not that its primary purpose is to do so).

a municipality's jurisdiction over an electric utility's rates, operations, and services. *See id.* § 33.001(a) (West 2007) (providing for circumstances in which governing body of municipality has exclusive original jurisdiction), § 33.004(a) (West 2007) (setting out impact of municipality's decision not to surrender jurisdiction to Commission), § 35.004 (West 2007) (providing for Commission's authority over utility providing wholesale transmission service within ERCOT). However, section 33.023 contains no language that would limit its applicability depending on whether the Commission or the utility does or does not have jurisdiction—exclusive, original, or otherwise. *See id.* § 33.023. Nor does section 33.023 contain any language limiting its applicability to only certain types of rates. Rather, section 33.023 requires only that the municipality be "participating in or conducting" the ratemaking proceeding. *See id.* This requirement was met here.

PURA section 33.023 authorizes the Commission to require an electric utility to reimburse certain expenses incurred by the governing body of a municipality participating in or conducting the utility's ratemaking proceeding. *See id.* The Commission's conclusion that section 33.023 does not apply to expenses incurred in a docket in which only wholesale transmission rates are set is contrary to the plain language of the statute.

The Commission contends that we can affirm its denial of the Cities' reimbursement request because the Cities failed to segregate between their expenses incurred in connection with the "rate case component" of the docket and their expenses incurred in connection with the other components of the docket. Alternatively, the Commission contends that we can affirm its denial of the Cities' reimbursement request based on reimbursement being inappropriate in this proceeding given that costs will be divided among the entire ERCOT. However, section 33.023 of

31

the PURA requires that the Commission make the determination of reasonableness. *See id.* § 33.023(b). It is clear from the Commission's order that no such determination was made in this case. Instead, the Commission incorrectly considered itself prohibited by statute from authorizing any reimbursement of expenses.

We hold that the district court correctly remanded the case to the Commission for a new determination pursuant to PURA section 33.023 of whether the Cities should be reimbursed any amount as reasonable expenses. *See Texas Dep't of Transp. v. T. Brown Constructors, Inc.*, 947 S.W.2d 655, 659 (Tex. App.—Austin 1997, pet. denied) ("Although courts have authority to hold that an agency erred and must correct its error, courts cannot dictate how to correct the error if, by doing so, the court effectively usurps the authority and discretion delegated to the agency by the legislature."). We do not hold that the Commission is required to grant the Cities' request for reimbursement. We recognize the possibility that the Commission may determine it to be unreasonable to reimburse—entirely or partially—the Cities in this case based on a distinction between expenses incurred in connection with the rate case component of the case and expenses incurred in connection with the other components of the case. Similarly, we recognize the possibility that the Commission may determine it unreasonable to reimburse—entirely or partially—the Cities in this case based on wholesale transmission costs being spread across all of ERCOT and the impact on municipal customers being more attenuated as a result. We express no opinion as to the reasonableness of either such determination. Our holding is that the Commission was not prohibited as a matter of law from ordering reimbursement of the Cities' expenses. Because the Commission based its refusal to reimburse the Cities' expenses on its incorrect statutory interpretation that it was

32

so prohibited, we believe that remand to the Commission on the reimbursement issue is appropriate for the Commission to reconsider the matter. *See Texas Citizens for a Safe Future & Clean Water v. Railroad Comm'n*, 254 S.W.3d 492, 502-03 (Tex. App.—Austin 2007, pet. filed) (remanding case to Commission because it had incorrectly considered itself prohibited from considering certain aspects of the "public interest"). Upon remand, the Commission must make a determination as required by PURA section 33.023.

### Conclusion

The Commission erred in determining that it was prohibited from granting the Cities' request for reimbursement of their ratemaking proceeding expenses. Therefore, we affirm the judgment of the district court as to its remand of the case to the Commission for its reconsideration of whether to reimburse the Cities for their expenses. As to the remainder of appellees' claims, we find no error in the Commission's final order. Consequently, we reverse the judgment of the district court that the Commission erred in granting a CCN to ETT, and we render judgment that the Commission's final order is affirmed in all respects other than its denial of the Cities' recovery of expenses incurred in the ratemaking proceeding.

### The Dissent

Unfortunately, due to the nature of the dissent, we are forced to respond to entirely unfounded allegations that have no bearing on the legal issues presented in this case and have not been raised by the parties. It is our view that the dissent serves no legitimate or productive jurisprudential purpose with respect to the process of hearing and deciding this case. It is with

33

great reticence and our apologies to the parties that we engage in this time-consuming and wasteful exercise.

We begin our discussion with the most fundamental problem—the "dissent" is not, in fact, a dissent to the disposition of the case. The dissent fails to express any opinion on the proper disposition of the case, ignoring the most basic obligation of a judge under the Code of Judicial Conduct, which is to "hear and decide matters assigned to the judge except those in which disqualification is required or recusal is appropriate." Tex. Code Jud. Conduct, Canon 3(B)(1), *reprinted in* Tex. Gov't Code Ann., tit. 2, subtit. G app. B (West 2005). Indeed, the dissenting judge pointedly declines to address the merits or express an opinion regarding the appropriate disposition of the case. Instead, the writing is a dissent to the procedure followed by this Court when a judge previously assigned to this case recused himself *before the case was decided*.[12]

The dissenting judge may disagree with the procedure followed by this Court to reconstitute a three-judge panel when one of the judges becomes unavailable. She may express that disagreement in a written opinion. However, the expression of this disagreement does not, by itself, satisfy her obligation to fulfill her duties as a panelist with respect to the disposition of the case. It is one thing to disagree with whether this Court followed the correct procedure in assigning a new

---

[12] Justice Pemberton was originally assigned to the panel on this case. Shortly after oral argument and before the panel had decided the case, he discovered that a family member arguably had an indirect financial interest in the outcome. He immediately disclosed this to the Court and recused himself. After determining that the remaining two members of the panel could not agree on a decision, the Chief Justice of this Court assigned a new third panelist to the case pursuant to Texas Rule of Appellate Procedure 41.1. Justice Pemberton took no part in the decision of this case.

34

judge to the panel when there was a recusal. It is another to refuse—as an assigned panelist—to decide the case.[13]

An assigned judge may disagree with any number of procedural rulings made by the court—such as the decision to grant or deny oral argument, the decision to grant or deny an extension to file a brief, or even a decision to grant or deny a motion to dismiss on procedural grounds—and still fulfill his obligation to hear and decide the case. Indeed, there are many decisions in the course of an appeal, ranging from relatively minor to potentially dispositive, that a judge might disagree with and even dissent to, and yet go on to decide the case.[14] The "dissent" here is not an opinion dissenting to the disposition of the case as determined by the majority. Rather, it is an expression of the dissenting judge's refusal to participate in the decision of the case at all due to her disagreement with the procedure for reconstituting the panel after the recusal.

This sort of refusal to participate in deciding a case while continuing as an assigned panelist is not allowed by the Code of Judicial Conduct. Canon 3(B)(1) of the Code of Judicial Conduct expressly provides: "A judge shall hear and decide matters assigned to the judge except those in which disqualification is required or recusal is appropriate." *Id.* The

---

[13] The dissent cites five cases that allegedly stand for the proposition that a judge may disagree with a procedural ruling in a case and use that disagreement as a basis to avoid deciding the case. Rather than providing support for the dissent's failure to participate in the decision of the case, however, each of the concurrences or dissents cited expressly addresses the proper disposition of the case. Thus, each of the judges in those opinions, while expressing opinions that differed with the majority on procedural issues, still recognized the obligation to participate in the decision of the case.

[14] For example, a panelist might disagree with a majority's decision not to dismiss a case on jurisdictional grounds. Under such circumstances, that panelist does not believe the court should be deciding the merits of the case at all. However, this does not relieve that panelist of the obligation to decide the merits in the event the majority rules that the case should not be dismissed. Many other examples exist.

35

dissenting judge has neither disqualified herself nor recused herself. Therefore, pursuant to Canon 3(B)(1), she is obligated to decide the case. It is not an option for an assigned judge to declare, "I disagree with the way the court reconstituted the panel after a recusal, and therefore, I will remain on the case as an assigned judge, but I will not actually participate in deciding the case." Continuing as a panelist, but refusing to participate in the decision, is not a permissible course of action.

The dissent also argues that she must remain on the panel and refuse to decide the case to preserve the parties' potential remedies to seek recusal, curiously, of her. Neither the rules relating to recusal nor the canons governing judicial conduct allow such a stance. If conflicted or subject to recusal, the dissenting judge must recuse. If not conflicted or subject to recusal, but worried that the parties might be concerned about it, the judge must put the parties on notice and allow them an opportunity to waive the issue before the decision is made in the case.[15] If not conflicted or subject to recusal and not concerned that the parties might think so, the judge must decide the case. No other options are allowed. It is not an option to remain on the panel and declare "I abstain from deciding this case because I think I may be conflicted or somehow tainted by another judge."

---

[15] We note that the dissenting judge has not at any point put the parties in this case on notice of what she perceives to be a "potential conflict" that prevents her from deciding the case and offered them the opportunity to waive it. Nor has the dissenting judge ever requested that the panel or the Court send the parties notice that she believes she has a "potential conflict," a description of the nature of her "potential conflict," or an opportunity to waive her "potential conflict"—a problematic fact considering the thesis of the dissent.

36

The effect of the dissent's position is to reduce—de facto—the participating panel in this case to two judges. The parties have an assigned panel of three judges as provided for in the rules of appellate procedure, but they only have the benefit of the opinions of two of those judges on the merits of the case. They will rightly ask, "Why?" The dissent's answer is that she is so troubled by sitting on this panel after Justice Pemberton voluntarily recused himself that she cannot even express an opinion on or adjudicate the case. She tells us that she is "conflicted" or somehow no longer "neutral" or "untainted" due to the fact that she heard oral argument with a judge who expressed a preliminary, tentative vote in the case after hearing oral argument, and later recused himself. If the dissenting judge honestly believes she is somehow "conflicted," "not neutral," or no longer "untainted" (to use a term adopted by the dissent, although its legal relevance to this area of the law is not apparent) by her contact with the recused judge to the point that it prevents her from performing her judicial duty to decide the case, she is obligated to recuse herself and not serve on the panel. She should not remain as an assigned judge. If she is not "conflicted" or "tainted," she is obligated to serve on the panel and decide the case. She has done neither.

For her core idea that a judge who discovers a ground for recusal after hearing oral argument somehow "taints" the other judges assigned to the panel, thus necessitating a new panel, the dissent cites to *no* authority—Texas, federal, secondary, or otherwise—and simply ignores the fact that Texas has a rule of appellate procedure that directly governs this situation. Texas Rule of Appellate Procedure 41.1(b) expressly sets out the procedure to follow in instances where an assigned judge cannot participate after a case has been argued. Rule 41.1(b) states that "[a]fter argument, if for any reason a member of the panel cannot participate in deciding a case,

37

the case may be decided by the two remaining justices," or if the two justices cannot agree, the chief justice may "designate another justice of the court to sit on the panel to consider the case." Tex. R. App. P. 41.1(b).

That is precisely what happened here. From a purely legal standpoint, the reconstitution of the panel under these circumstances is the same when a panelist becomes unavailable *for any reason. See id.* Plainly, Rule 41.1 contemplates that assigned judges do not necessarily become ineligible to decide a case simply by the presence of a panelist at oral argument who later recuses himself, or the participation of a panelist before the case is decided who ultimately does not participate in the decision due to a recusal or for any other reason.

The dissent does not argue that Rule 41.1's mandatory procedure was not followed here. Instead, the dissent argues that "justice requires" a different practice in these situations and that it is somehow a denial of due process not to follow her preferred—and as yet unadopted—procedure. However, this is a matter for the dissenting justice to take up with the Texas Supreme Court Rules Advisory Committee. Regardless of what the individual appellate judges on a panel may think of the procedures outlined in the rules of appellate procedure, we are bound to follow them until they are changed. Interestingly, despite the dissent's elaborate hyperbole with respect to "justice requiring" something other than the procedure mandated in the rules of appellate procedure, there is no authority of any kind for the proposition that there is a constitutional due process problem with the procedure set out in Rule 41.1.

The dissent relies heavily on the notion that once the ground for recusal was discovered, the recused judge was obligated to present the recusal issue to the parties and

38

allow them an opportunity to waive the ground for recusal. There is no authority for the dissent's proposition that a judge who discovers a ground for recusal must allow the parties an opportunity to waive the ground for recusal. Rule 18b(5) relating to waiver of grounds for recusal by parties is permissive. *See* Tex. R. Civ. P. 18b(5); *see also* Tex. Code Jud. Conduct, Canon 3(B)(1) ("A judge shall hear and decide matters assigned to the judge *except those in which disqualification is required or recusal is appropriate*." (Emphasis added.)). It does not require a judge who is not inclined to serve on a case where a ground for recusal may exist to present the issue to the parties and serve on the case if the ground for recusal is waived.[16] It allows such a procedure under certain circumstances if everyone—including the judge—is agreeable to it.[17] *See, e.g.*, *Nueces County Drainage & Conservation Dist. v. Bevly*, 519 S.W.2d 938, 949-51 (Tex. Civ. App.—Corpus Christi 1975, writ ref'd n.r.e.) (supp. op.).

---

[16] Indeed, the dissenting judge does not follow the very procedure she claims is required. The dissenting judge has recused herself from a number of cases after being assigned. We are aware of no example of an instance where the dissenting judge put the parties on notice of a ground for recusal and gave them an opportunity to waive the issue before recusing herself. There are numerous examples of the dissenting judge recusing herself without putting anyone—parties or the court—on notice of the basis or ground for the recusal or allowing anyone to waive the ground. The dissenting judge suggests that the timing of when a judge learns of a basis for recusal somehow dictates whether the judge must give the parties an opportunity to waive recusal. There is, of course, no basis in the rules or case law for such a notion.

[17] We note that the parties were put on notice of the recusal with ample opportunity to raise an objection or complaint regarding the procedure this Court has followed, both with respect to the recusal and to the reconstitution of the panel. No party has raised any objection or complaint. The dissent has injected her complaint into this case sua sponte without the benefit of any objection by a party, any party having raised the issue, or any party briefing the question. The parties will be understandably surprised and chagrined to learn that they do not have the benefit of all three panelists' views on this case due to an issue none of them has raised or complained about, and that the disposition of this case has been substantially delayed due to what has turned out to be a rather lengthy process of producing opinions relating to this "dissent."

39

In addition to refusing to participate in the decision of the case without any legal basis, the dissent misreports the facts. A crucial element of the dissent's complaint against Justice Pemberton and this Court is the dissent's repeated allegation that Justice Pemberton participated in "deliberations" and/or "the decision-making process" in this case. The truth is that he did not. The implication of the dissent's rendition is to suggest that the recused judge participated in discussions with the other panelists regarding the merits of the case and exercised some sort of unstated influence on the other panelists (including, presumably, on the dissenting judge herself). This is not the case. The only contact that the recused judge had with the other panel members on this case was to sit in oral argument and then express a tentative vote (without discussion or any sort of deliberation of the merits) immediately after oral argument regarding whether the case should be affirmed or reversed.[18] This author also expressed a tentative vote without any discussion of the merits. Both this author and Justice Pemberton expressed the need for further study to develop our views of the case due to the complexity of the issues. The lack of any discussion or deliberation of the merits at that point was not atypical for a case of this complexity. We both acknowledged that our views on the issues were not fully developed and our tentative vote might change based on further study of the legal authorities and the record. The author of the dissent did not express any vote or opinion in the case—tentative or otherwise—other than to say that she needed to "look at the record."[19] The entire event that the dissent likes to term a "deliberation" when the panel left the bench after oral argument lasted less than a minute. It is more appropriately described as

---

[18] Justice Pemberton had not yet discovered the basis for his recusal.

[19] Indeed, the dissenting judge has not expressed an opinion or vote on the merits of this case at any point.

40

a postponement of deliberation due to the need for more study. All of the panelists realized after oral argument that further study and record review would be required for dispositive opinions to be developed. In short, contrary to the repeated assertions by the dissent that the recused judge participated in the "decision-making process," the fact of the matter is that the recused judge did not participate in *any* substantive discussions or deliberations of this case with either of the other panel members (including the dissenting judge).

Justice Pemberton did not participate in the decision in this case. In fact, the dissenting judge has not participated in the decision in this case. The case has been decided by this author and Justice Puryear.

The motive for the writing that is styled a dissent in this case escapes the majority. Nonetheless, the dissent takes a position that is plainly untenable under the rules of appellate procedure and under the Code of Judicial Conduct. The dissenting judge cannot declare herself "conflicted" or "tainted," continue as an assigned judge on the panel to complain about a procedural decision that does not impact the merits, and yet refuse to fulfill her obligation as an assigned judge to decide the case. Under the law, she is obligated to either recuse herself (if she truly believes she is "conflicted" or "tainted" or no longer unbiased), or decide the case (if she elects to continue as an assigned judge because she does not actually think she is "conflicted" or "tainted").

Here the dissent has done neither. She has not recused herself, nor has she participated in deciding the case. This is not only a failure to fulfill obligations imposed by the Code of Judicial Conduct, *see* Tex. Code Jud. Conduct, Canon 3(B)(1), but it is also a disservice to the members of this Court who have done their duty pursuant to the applicable rules, *see* Tex. R.

App. P. 41.1, a disservice to the recused judge who acted quite properly and fairly, a disservice to the public who now have an entirely unnecessary discussion of internal court procedure deposited into case law and many hours of judicial resources wasted on the effort, as well as a disservice to the parties in this case who are entitled to the participation and opinions of all judges assigned to and serving on the panel for purposes of the disposition of the case.

_____

G. Alan Waldrop, Justice

Before Justices Patterson, Puryear and Waldrop;
    Dissenting Opinion by Justice Patterson

Affirmed in part; Reversed and Rendered in part

Filed:   March 26, 2010